719 So.2d 797 (1998)
LIFE INSURANCE COMPANY OF GEORGIA
v.
Janelle S. SMITH.
LIFE INSURANCE COMPANY OF GEORGIA
v.
Christina SMITH.
LIFE INSURANCE COMPANY OF GEORGIA
v.
Sheryl VANCHE.
LIFE INSURANCE COMPANY OF GEORGIA
v.
Priscilla DUFFEE.
LIFE INSURANCE COMPANY OF GEORGIA
v.
Sharen L. GREEN.
Garry R. WINSETT
v.
Janelle S. SMITH.
Garry R. WINSETT
v.
Christina SMITH.
Garry R. WINSETT
v.
Sheryl VANCHE.
Garry R. WINSETT
v.
Priscilla DUFFEE.
Garry R. WINSETT
v.
Sharen L. GREEN.
1951773 to 1951777 and 1951795 to 1951799.
Supreme Court of Alabama.
July 17, 1998.
*799 Paul A. Howell, Jr., of Pursley, Howell, Lowery & Meeks, Atlanta, GA; and I. David Cherniak and W. Alexander Gray, Jr., of Johnstone, Adams, Bailey, Gordon & Harris, Mobile (withdrew April 7, 1997), and Benjamen T. Rowe and Rebecca D. Parks, Mobile (substituted as counsel April 4, 1997), for appellants Life Insurance Co. of Georgia.
Edward A. Dean and P. Vincent Gaddy of Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, L.L.C., Mobile, for appellant Garry R. Winsett.
Bryan G. Duhé and Eaton G. Barnard of Duhé & Barnard, P.C., Mobile; and Thomas H. Benton, Jr., of McFadden, Lyon & Rouse, L.L.C., Mobile, for appellees.
PER CURIAM.
Life Insurance Company of Georgia and Garry R. Winsett appeal from judgments entered on jury verdicts in five actions commenced by separate plaintiffs, arising out of the sale of insurance policies to those plaintiffs. We reverse and remand.
These consolidated actions arose out of the following general facts: In April 1991, Liberty Church (the "Church") in Fairhope was operating Bay Christian Academy (the "Academy"). The Academy taught children of the ages of kindergarten through middle school. Janelle Smith and Christina Smith, mother and daughter, respectively; Sheryl Vanche; Priscilla Duffee; and Sharen Green (the "plaintiffs") were employees of the Academy.
At that time, Garry Winsett was an agent for Life Insurance Company of Georgia ("Life of Georgia"). With the assistance of Church officials, Winsett conducted a series of meetings with the plaintiffs to discuss establishing a "cafeteria plan," as recognized and defined by Internal Revenue Code ("I.R.C.") § 125 and regulations of the Internal Revenue Service (the "IRS"). During these meetings, the plaintiffs allege, Winsett represented to them that Life of Georgia would enroll them in a plan allowed by IRS regulations whereby a portion of their salarybefore the assessment of income and Social Security taxeswould be used to establish and fund for each of them a "savings plan" or a "retirement program." According to Winsett, pre-tax dollars deducted from each plaintiff's regular biweekly paycheck would fund these savings or retirement plans. Winsett also represented that the plans would not actually cost the plaintiffs anything because the money they paid into them would be money that, but for the operation of the plan in compliance with § 125, *800 would be paid in taxes. Some, or all, of the plaintiffs concluded from Winsett's representations that they would have savings or retirement "accounts" and that they would be able to withdraw money from these accounts any time it was needed for a permissible purpose.
At the conclusion of this series of meetings, Winsett sold each of the plaintiffs a universal life insurance policy, which Life of Georgia technically entitles "Supermatic Flex Life" or "SuperFlex." Thus, rather than funding a pure savings or retirement account, the pre-tax dollars deducted from the plaintiffs' paychecks were paid to Life of Georgia for life insurance policies that after a time would build a cash value. Whether, or under what conditions, the plaintiffs ever physically received life insurance policies was a matter of dispute at trial. However, beginning in May 1991, all the plaintiffs paid the cost of the insurance premiums to Life of Georgia through payroll deductions.
Sometime thereafter, the Smiths noticed that their paychecks had a deduction listed under the heading "INS." They asked Winsett to explain the meaning of the INS designation and asked whether they were purchasing life insurance. They say Winsett denied that they were purchasing life insurance. In June 1992, Vanche asked Winsett for a withdrawal of $300 from her "savings account" in order to buy a train ticket to visit her mother in Iowa; she says Winsett told her that regulations prevented her from withdrawing money from the account for several years.
Approximately a year after Green began to have paycheck deductions to Life of Georgia, she received in the mail a notice indicating that her life insurance policy had a zero cash value. In August 1992, Green requested that Life of Georgia refund the money she had paid it, but her requests were denied. The four other plaintiffs also requested refunds from Life of Georgia, and their requests were also denied.
Green filed a complaint against Winsett and Life of Georgia in August 1992, within two years of the alleged misrepresentations. On September 9, 1993, more than two years after the alleged misrepresentations, Vanche, Janelle Smith, Christina Smith, and Duffee filed similar complaints against Winsett and Life of Georgia. Each of the five plaintiffs alleged that Winsett had misrepresented or suppressed the fact that "she was purchasing a life insurance policy" instead of a "retirement plan," and that, in reliance upon the misrepresentations or suppressions, she had "contributed funds, to what she believed was a retirement plan." Each further alleged that Winsett had "intentionally deceived [her] by representing that [he was] selling a tax-free retirement program when in fact [he was] selling insurance." The complaints were all subsequently amended to include claims that Life of Georgia was "guilty of negligently and/or recklessly hiring, training and supervising ... Garry Winsett."
The actions were consolidated for trial and were tried in February 1996. The jury returned general verdicts against Winsett and Life of Georgia, awarding each plaintiff $0 in compensatory damages and $200,000 in punitive damages. Winsett and Life of Georgia appeal from the five judgments entered by the trial court on those verdicts.
Winsett and Life of Georgia contend (1) that the verdicts awarding punitive damages, but $0 compensatory damages, are invalid as a matter of law; (2) that the fraud and negligence claims of four of the five plaintiffsVanche, Janelle Smith, Christina Smith, and Duffeefiled more than two years after May 1991, are barred by the statute of limitations; (3) that the trial court erroneously admitted evidence of fraudulent acts by Winsett other than those of which these plaintiffs complain; and (4) that the verdicts were "grossly excessive" and, therefore, violated constitutional due process provisions. Although the defendants challenged the sufficiency of the evidence supporting the plaintiffs' claims, by way of motions for summary judgment and motions for judgment as a matter of law,[1] the trial court denied those *801 motions and, on appeal, the defendants have not challenged the sufficiency of the evidence supporting the judgments.

I. The Status of the Claim Based on the Plaintiffs' Potential Tax Liability

In their fraud claims the plaintiffs sought compensatory damages, including damages for mental anguish, based on a claim that they had incurred a potential income tax liability; they also claimed compensatory damages based on the fact that they purchased universal life policies when they thought they were purchasing retirement plans. As for the claims based on the alleged potential tax liability, it is uncontroverted that under the I.R.C. a § 125 cafeteria plan may not be used to purchase a benefit that defers the receipt of compensation or that accumulates cash value. I.R.C. § 125(d)(2)(A). Thus, because the Life of Georgia life insurance policies paid for by the plaintiffs through pre-tax payroll deductions accumulated a cash value, the cafeteria plans established for the plaintiffs by Winsett and Life of Georgia were invalid. Accordingly, when the plaintiffs filed federal tax returns for the 1991 and 1992 tax years, they incurred the potential for a tax liability to the IRS should that agency one day attempt to collect additional taxes for those years.
The merit of the plaintiffs' claims based on their potential tax liability was a major issue in the trial court. In its motion for a summary judgment, Life of Georgia argued that an action for damages based on a tax liability does not accrue until the IRS makes a tax assessment, and Life of Georgia contended that no assessment had been made. Before trial, Life of Georgia filed a motion in limine, seeking to exclude the plaintiffs' evidence of an alleged tax liability. However, before trial, Life of Georgia established a trust for the benefit of persons for whom it had established invalid cafeteria plans, in order to guarantee payment of any tax liability those persons might suffer as a result of the invalidity of the plans. The trial court denied Life of Georgia's motion in limine, and during trial it admitted evidence of the plaintiffs' alleged tax liability, on the basis that it was relevant to the plaintiffs' claims for damages for mental anguish. During trial, Life of Georgia argued that because it had established the trust the plaintiffs had suffered no damage.
In System Dynamics Int'l, Inc. v. Boykin, 683 So.2d 419, 421 (Ala.1996), this Court held that in the context of a potential tax liability there is no "completed wrong" until the IRS assesses the taxpayer for taxes and penalties. However, in Jackson v. Secor Bank, 646 So.2d 1377 (Ala.1994), this Court had held that the plaintiff's claim based on potential tax liability accrued when the tax return was filed, under the circumstances of that case. Because the defendants have not raised on appeal the issue of the sufficiency of the evidence to support the plaintiffs' claim arising from the invalidity of the cafeteria plan, we treat the plaintiffs' claims for damages based on a potential tax liability as actionable pursuant to the doctrine of the law of the case. See Brooks v. Goldhammer, 608 So.2d 394 (Ala.1992) (holding that an unappealed summary judgment becomes the law of the case); Sellers v. Dickert, 194 Ala. 661, 69 So. 604 (1915) (holding, in a second appeal, that a matter that had occurred before the first appeal, but that was not raised in the first appeal, was the law of the case).

II. Statute of Limitations

Winsett and Life of Georgia argue that the fraud and negligence/wantonness claims of four of the five plaintiffsVanche, Janelle Smith, Christina Smith, and Duffeeare barred by the two-year statute of limitations, Ala.Code 1975, § 6-2-38. They contend that the acts or omissions on which these claims are based occurred no later than May 1991, when Winsett made the representations that induced the plaintiffs to participate in what Life of Georgia called the "SuperFlex" cafeteria plan. Thus, they insist, the actions of Vanche, the Smiths, and Duffee, commenced on September 9, 1993, were barred by the statute of limitations.
In response, these four plaintiffs say that the question whether the statute of limitations bars a fraud claim is almost always a *802 question of fact for the jury, and they say that the defendants failed to prove that these plaintiffs, more than two years before they sued, knew of facts that would have put a reasonable person on notice of the alleged fraud. All five plaintiffs argue that they did not see that they were signing insurance applications and that only one of them received a life insurance policy from Life of Georgia. They point out that the plaintiff who did receive a life insurance policy from Life of Georgia testified that she did not know when she received it and that she could have received it as late as June 1992; that date would be well within two years of the filing of these complaints.
The plaintiffs also argue that their claims alleging negligent or wanton hiring, training, and supervision are not barred by the statute of limitations. They note that one complaint was filed against Life of Georgia on August 27, 1992, and that the other four were filed on September 9, 1993, and they argue, among other things, that Life of Georgia ratified Winsett's actions in August 1992 and September 1992, when it denied their requests for refunds. Thus, they contend their complaints were filed within two years of Life of Georgia's alleged misconduct.
Winsett and Life of Georgia argue that the plaintiffs' fraud claims and their claims alleging negligent or wanton hiring, training, and supervision accrued no later than May 1991, when, the plaintiffs allege, Winsett made fraudulent statements to the plaintiffs. The plaintiffs' complaints were filed before the date of this Court's opinion in Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997). Thus, the fraud claims must be judged under the "justifiable reliance" standard of Hickox v. Stover, 551 So.2d 259 (Ala.1989). Under that standard, the question of when a plaintiff discovered a fraud may be decided as a matter of law only if the evidence indicates that at a particular time the plaintiff actually knew of facts that would have put a reasonable person on notice of the fraud. Hicks v. Globe Life & Acc. Ins. Co., 584 So.2d 458 (Ala.1991); Kelly v. Connecticut Mut. Life Ins. Co., 628 So.2d 454 (Ala.1993). In Liberty Nat'l Life Ins. Co. v. Parker, 703 So.2d 307, 308 (Ala.1997), we recognized that under the justifiable reliance standard "`[f]raud is discoverable as a matter of law for purposes of the statute of limitations when one receives documents that would put one on such notice that the fraud reasonably should be discovered.'" (Quoting Kelly, 628 So.2d at 458) (emphasis omitted; citations omitted). We also recognized that where a plaintiff, after receiving such notice, is misinformed by the defendant, "`he running of the limitations period is ... tolled as to the fraud claim.'" Parker, 703 So.2d at 309 (quoting Kelly, 628 So.2d at 459) (emphasis omitted). Although the plaintiffs in these cases now before us arguably received documents that would have put reasonable persons on notice of fraud, Winsett actively and repeatedly misinformed them of the nature of the product they had purchased, thus tolling the limitations period on the fraud claims. Thus, the trial court properly denied the defendants' motions for judgment as a matter of law on the fraud claims, insofar as those motions were based on the statute of limitations.
In general, a negligence cause of action accrues when a plaintiff is entitled to maintain an action, even if at that time the full amount of damage may not be apparent. Long v. Jefferson County, 623 So.2d 1130 (Ala.1993). In Booker v. United American Ins. Co., 700 So.2d 1333 (Ala.1997), this Court held that the plaintiff insureds' cause of action against an insurer based on negligent or wanton supervision of one of its agents accrued on the date the plaintiffs signed the application for an insurance policy (that was not the kind of policy they desired) and made a premium payment. Thus, Booker supports the defendants' argument that the plaintiffs' cause of action accrued in May 1991, when the defendants say the plaintiffs signed applications for life insurance and their payroll deductions began. However, under the facts of this case, we believe Booker is not controlling. The plaintiffs presented evidence of ongoing and continuing negligence or wantonness on the part of Life of Georgia with regard to its oversight of Winsett in his business relationship with the plaintiffs through August 1992, when Winsett left Life of Georgia's employ. See Mardis v. Robbins Tire & Rubber Co., 669 So.2d 885 (Ala.1995) (acknowledging that a negligent-supervision *803 claim alleged an ongoing tort and holding that the claim was time-barred only as to acts that had occurred more than two years before the date of the complaint). Thus, the negligence/wantonness claim asserted by Vanche, Janelle Smith, Christina Smith, and Duffee against Life of Georgia is barred by the statute of limitations to the extent that it involves actions by Life of Georgia that occurred before September 9, 1991, but it is not barred in relation to actions by Life of Georgia occurring on or after September 9, 1991. Thus, the trial court erred by denying Life of Georgia's motions for partial judgment as a matter of law on these four plaintiffs' negligence/wantonness claim.
Because the negligence/wantonness claim went to the jury in full when it should not have as to four of the five plaintiffs, we have a "good count-bad count" situation in this appeal analogous to that in Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981). Here, the defendants, by motions for judgment as a matter of law, asserted the defense of limitations and those motions were denied. We cannot assume that the verdicts were based only on the plaintiffs' claims that are not subject to the defense of limitations. Accordingly, the judgments based on the jury verdicts for Vanche, Janelle Smith, Christina Smith, and Duffee must be reversed; as to these plaintiffs' claims, we must remand for a new trial.

III. The Alleged Inconsistency in the Jury Verdict

Although we have reversed the judgments in favor of Vanche, Janelle Smith, Christina Smith, and Duffee, based on the limitations defense, the judgment in favor of Green is not affected by that reversal. Thus, we must consider whether the jury could properly award Green $0 in compensatory damages and $200,000 in punitive damages. A similar issue could arise as to the other plaintiffs on retrial of their claims.
Relying on O.K. Bonding Co. v. Milton, 579 So.2d 602 (Ala.1991), and other opinions from this Court, Winsett and Life of Georgia argue that this Court should reverse the judgment against them or remit the punitive damages award to $0. They say that under Alabama law, punitive damages cannot be awarded unless the jury has found that the plaintiff was injured or damaged, and they note that in this case the jury awarded each of the plaintiffs $0 in compensatory damages and $200,000 in punitive damages. The defendants point out that in O.K. Bonding this Court reversed an award of punitive damages and entered a judgment for the defendant, where the jury had awarded no nominal or compensatory damages, and the present defendants say the rule of that case must be followed here.
Winsett and Life of Georgia note other opinions from this Court, such as Caterpillar, Inc. v. Hightower, 605 So.2d 1193 (Ala.1992), and First Bank of Boaz v. Fielder, 590 So.2d 893 (Ala.1991), wherein this Court has affirmed judgments awarding punitive damages even though nominal or compensatory damages had not been awarded. However, the defendants categorize those cases as "exceptional" and say that in each of them it was clear that the plaintiff had been injured or damaged. They contend that in this present case it is clear the plaintiffs were not damaged or injured and that these plaintiffs therefore cannot be awarded punitive damages. Finally, the defendants say that in light of the United States Supreme Court's opinion in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), which requires, as a matter of constitutional law, a reasonable relationship between punitive and compensatory damages, even the "exceptional cases" may no longer be viable.
In response, the plaintiffs argue that O.K. Bonding has been "all but overruled" by this Court, citing Garrett v. City of Auburn, 623 So.2d 1033 (Ala.1993); Caterpillar, supra; Shoals Ford, Inc. v. McKinney, 605 So.2d 1197 (Ala.1992); and First Bank of Boaz, supra. In each of those cases, this Court affirmed a judgment based on a jury's award of punitive damages, even though the jury had not awarded compensatory damages. They argue that under Alabama law, as expressed by these cases, an award of compensatory damages is not necessary for a jury to award punitive damages, if the plaintiff produced *804 substantial evidence of an injury, as well as substantial evidence of the misconduct supporting the award of punitive damages.
The plaintiffs say that this is a unique case where the only significant monetary damage they suffered is the tax liability, which Life of Georgia countered by establishing the trust fund for the payment of any taxes the plaintiffs may have incurred. They say that Life of Georgia argued to the jury that the plaintiffs' paychecks were not reduced, because the pre-tax payroll deductions for the insurance premiums were roughly equivalent to the taxes that the plaintiffs otherwise would have paid and that Life of Georgia "pounded home" to the jury that the trust it established prevented the plaintiffs from suffering damage, resulting in the jury's $0 compensatory damages award. The plaintiffs say that Life of Georgia's creating the $400,000 trust is an admission that the plaintiffs were injured and an admission of liability. They argue that to follow Life of Georgia's logic regarding the relationship of compensatory and punitive damages would be analogous to allowing a thief to go unpunished if he returned the stolen property when caught. In sum, the plaintiffs argue that they presented substantial evidence that they incurred monetary damage in the form of a tax liability and substantial evidence that they incurred mental anguish related to that tax liability, and they argue that that damage and injury are sufficient to support an award of punitive damages even though the jury failed to award any dollar amount of compensatory damages.
We are squarely faced, at least as to the plaintiff Green, with the question whether a jury can award punitive damages without awarding compensatory damages. The answer to that question turns on an analysis of the role of nominal damages in fraud cases in Alabama. This Court, although sharply divided, has issued a series of opinions upholding punitive damages awards in instances where the jury did not award compensatory damages, based upon the Court's determination that in those cases nominal damage could be inferred from the evidence presented at trial.
In an earlier time, before courts began to have constitutional concerns over the relationship between amounts awarded as compensatory damages and the amounts awarded as punitive damages, verdicts were most often, if not always, general. Where a defendant attached a general verdict expressing a single dollar amount for the award to the plaintiff, the Court often was asked to uphold the verdict on a recognition that at least some nominal amount of the general verdict was appropriately referable to the plaintiff's having shown a right to at least nominal damages and, therefore, that the excess over nominal damages could properly be upheld as punitive damages. See Super Valu Stores, Inc. v. Peterson, 506 So.2d 317 (Ala. 1987) (upholding a general verdict for an amount obviously in excess of nominal damages where the jury heard evidence that the plaintiff had suffered injury from the defendant's misrepresentation by retiring from his job to take an employment opportunity that never came to fruition); Oates v. Glover, 228 Ala. 656, 154 So. 786 (1934) (upholding a general verdict for an amount obviously in excess of nominal damages where the jury heard evidence tending to show "some actual damage" to the plaintiff in the sale of a new automobile represented as one of a model still in production, although in fact production had been discontinued).
In 1987, the legislature introduced the requirement that in a tort case, other than a wrongful-death case, the fact-finder itemize "past damages," "future damages," and "punitive damages." See Ala.Code 1975, § 6-11-1. Since then, cases dealing with verdicts from which more can be deciphered than previously was decipherable from the old general verdict form have produced a series of divided opinions. The first notable case is The Booth, Inc. v. Miles, 567 So.2d 1206 (Ala.1990), where, after a co-defendant had been dismissed on a pro tanto settlement, the jury returned a verdict against the remaining defendant, stating: "It is our intention to assess total damages for the Plaintiff and against the Defendant at $50,000.00." 567 So.2d at 1207. On appeal, the defendant argued that the verdict against it was inconsistent because the jury wrote "$0" in the *805 space provided on the form for compensatory damages.[2] This Court affirmed the judgment based on the jury verdict, noting the confusing nature of the trial judge's jury instruction on how to treat the pro tanto settlement, and stating that "we do not require a specific award of actual [compensatory] damages in order to support an award of punitive damages" when there is sufficient evidence of actual damage. Id. at 1208.
The next case in the sequence is O.K. Bonding Co. v. Milton, 579 So.2d 602 (Ala. 1991), where a judgment was entered on a verdict of $0 in nominal or compensatory damages and $15,000 in punitive damages. This Court reversed the judgment, citing Mid-State Homes, Inc. v. Johnson, 294 Ala. 59, 311 So.2d 312 (1975), and stating, "It is settled that punitive damages cannot be awarded unless the jury also awards nominal or compensatory damages." 579 So.2d at 604. In Mid-State Homes, this Court had affirmed a judgment based on a general verdict (awarding an amount that was implicitly divisible into a $715 restitutionary award and an $11,785 punitive award) and recognized the rule that an award of at least nominal damages was necessary to support an award of punitive damages.
Then, in First Bank of Boaz v. Fielder, 590 So.2d 893 (Ala.1991), the jury awarded $0 compensatory damages on a suppression count, yet awarded the plaintiff punitive damages. This Court upheld the punitive damages award, citing the rule that a non-compensable violation of a legally protected right that would support only an award of nominal damages, in recognition of the tort, was sufficient to satisfy the injury element of a fraud claim. This Court stated that it had never required an award of nominal damages as a prerequisite to an award of punitive damages, and it refused to require such an award. Then the Court specifically held that an award of compensatory damages or nominal damages was not a prerequisite to an award of punitive damages. However, this Court later candidly acknowledged that when it wrote its opinion in First Bank of Boaz it was unaware of the previously published opinion in O.K. Bonding. See Shoals Ford, Inc. v. McKinney, 605 So.2d 1197, 1199 (Ala. 1992).
In Caterpillar, Inc. v. Hightower, 605 So.2d 1193 (Ala.1992), the stage was set for a collision between O.K. Bonding and First Bank of Boaz. In Caterpillar, the jury verdict form stated that the entire award of $250,000 was punitive. This Court upheld the judgment entered on the jury's award, citing First Bank of Boaz for the rule that an award of compensatory damages was not necessary for a jury to award punitive damages. However, the majority's effort in Caterpillar to distinguish O.K. Bonding was strongly challenged in a dissenting opinion.
Next in this line of cases is Shoals Ford, Inc. v. McKinney, 605 So.2d 1197 (Ala.1992), where a plurality of the Court affirmed an award of only punitive damages on the ground that the record supported a finding of injury, "at least nominally." 605 So.2d at 1199. One Justice's concurrence found O.K. Bonding and First Bank of Boaz irreconcilable and suggested that O.K. Bonding be overruled. Two dissenting opinions also found the two cases irreconcilable, but maintained that O.K. Bonding stated the better rule of law. Each of the two dissenting opinions mentioned that § 6-11-1 required specificity in verdicts. 605 So.2d at 1202, 1204.
After Shoals Ford, the Court decided Garrett v. City of Auburn, 623 So.2d 1033 (Ala. 1993). In Garrett, it followed the rule of law established by First Bank of Boaz and Caterpillar, without citing O.K. Bonding. Because it is not unreasonable for these present plaintiffs to argue that O.K. Bonding has been impliedly overruled, we believe a clarification in the law of damages is essential. We now recognize that Justice Almon's dissent in Shoals Ford accurately stated the issue when he pointed out that only since we have seen verdicts expressed more specifically than as a generic lump sum have we had problems. In earlier cases upholding punitive damages awards where there was a lump sum verdict, the Court had quite correctly parsed the record to see if a portion of the *806 generic dollar verdict was fairly referable to nominal damages. However, we believe that this practice of combing the record on appeal for evidence of an injury to the plaintiff can no longer be applied to verdicts that separate compensatory and punitive damages or simply label the award solely as punitive damages.
In this era following BMW of North America, Inc. v. Gore, supra, we recognize that closer scrutiny of the relationship between compensatory damages and punitive damages is necessary, and we recognize that causes of action have accrued since the effective date of § 6-11-1, which contains a requirement of specificity in verdicts, a requirement that may still apply to some extent even after Clark v. Container Corp. of America, Inc., 589 So.2d 184 (Ala.1991). Moreover, we recognize the mandate for due process and for the administration of justice "without sale, denial, or delay," as secured to litigants by Art. I, § 13, Alabama Constitution of 1901. We now require, therefore, that a jury's verdict specifically award either compensatory damages or nominal damages in order for an award of punitive damages to be upheld. Thus, we overrule First Bank of Boaz, Caterpillar, Shoals Ford, and Garrett, to the extent those opinions conflict with this rule of law.
A factor behind the result in the First Bank of Boaz line of cases was concern over the inequity of a defendant's avoiding liability for punitive damages in instances where: (1) the failure of the jury to award nominal damages did not necessarily indicate the absence of a right to recover nominal damages; (2) the plaintiff was made whole by a pro tanto settlement; or (3) the plaintiff otherwise was fully compensated for conduct for which the defendant was liable, but no nominal damages were awarded.
Where there is a pro tanto settlement, the invasion of legal right with injury, for which the defendant would have been liable but for the settlement, should support an award of nominal damages. See Pihakis v. Cottrell, 286 Ala. 579, 243 So.2d 685 (1971) (holding that the defendant's tender of relief to the plaintiff did not defeat the plaintiff's claim for nominal damages and, therefore, that a general verdict obviously including punitive damages could be upheld). It is clear that a liable defendant should not be entitled to more favorable treatment just because another party has acted to made the plaintiff whole. The rule of Pihakis should apply to recognize a plaintiff's right to recover nominal damages and, thus, punitive damages, where the source of the plaintiff's being made whole is a co-defendant's pro tanto settlement or any other source of compensation for injury for which the defendant is liable.
Under this rule, the jury's verdict must include a monetary award of compensatory damages or, where appropriate, an award of nominal damages only. If compensatory damages have been eliminated by reason of payments or other rights created for the plaintiff subsequent to the injury or harm under circumstances making the defendant liable, thereby making an award of nominal damages appropriate, the jury verdict should indicate the jury's finding that the plaintiff is entitled to nominal damages, pursuant to proper instructions from the trial court. In instances where punitive damages also are awarded, a court can consider, in any post-verdict analysis of the relationship between the compensatory damages award and the punitive damages award, the total amount of compensatory damages for which the defendant could have been liable but for the plaintiff's having been made whole, regardless of how the plaintiff was made whole.
Where the award of nominal damages constitutes the full measure of compensation for which the defendant is, or could have been, liable, an award of punitive damages based on the award of nominal damages must withstand scrutiny under the constitutional protections available to a defendant. Questions as to (1) whether punitive damages for reprehensible conduct in the invasion of a legal right constituting nominal damage only must bear some relationship to an analogous criminal penalty, if available, (2) whether the cost of litigation could justify resort to a multiple of the criminal sanction as the standard in a proper case, or (3) whether perceived inadequacies in the amount of such *807 penalties is a matter for redress by the legislature or the basis for a court to disregard the penalties as a useful standard, must all await determination in a case where the question is fully addressed by the parties.
The rule announced today will require that the jury be properly charged on the issue of nominal damages in a case where only such damages are appropriate, and it will require that the form of verdict provide the jury with the opportunity to answer an interrogatory in a manner such as in the example set forth below:

FORM OF VERDICT

Verdict for the Plaintiff
1. Check One:
() We find that the plaintiff is entitled to compensatory damages in the amount of $__________. (Here fix an amount other than zero).[3]
() We find that the plaintiff is entitled to recover nominal damages only.
2. Check One:
() We find that the plaintiff is not entitled to recover punitive damages.
() We find that the plaintiff is entitled to recover punitive damages in the amount of $____________.
Verdict for the Defendant
() We find the issues in favor of the defendant.
After analyzing the prior opinions of this Court discussed above, we conclude that for this Court to penalize the plaintiff Green for her failure to require either a verdict for compensatory damages or a verdict for nominal damages as a prerequisite to an award of punitive damages would be an unfair departure from the recent trend of the precedents. The plaintiffs' trial strategy of not stressing the evidence of their monetary injury and mental anguish and seeking only punitive damages was fairly based on the existence of the trust fund created by Life of Georgia and on the holding of First Bank of Boaz and its progeny. While we will not apply the new rule of law announced today to the judgment in favor of the plaintiff Green, and thus will not reverse and render a judgment for the defendants, we are unwilling to search this trial record, as this Court has done in some previous cases, for some indicium of nominal damage. We therefore reverse the judgment for Green and remand her case for a new trial in which the rule expressed in this opinion will be applied. If evidence of the trust fund established to compensate the plaintiffs for any future tax liability arising from the invalid cafeteria plans is admitted in the new trial, the trial court must clearly instruct the jury on the issue of nominal damages. However, if on retrial the jury finds that the plaintiffs suffered mental anguish and awards them compensatory damages for that injury, there would be no need for an award of nominal damages. Consistent with the treatment afforded the plaintiff Green today, this new rule should not be applied so as to require reversal and the rendering of a judgment for the defendant in any case tried before today.

IV. Extrinsic Evidence

Because we are remanding these cases for a new trial, for the sake of judicial economy we address an issue that is likely to arise again. Life of Georgia and Winsett contend that the trial court erroneously admitted extrinsic evidence of Winsett's malfeasance, namely, evidence of fraudulent acts other than those of which these plaintiffs complain. The challenged evidence involved Winsett's dealings in August 1992 with Kathy Stewart, a Georgia resident, who received life insurance proceeds from Life of Georgia upon the death of her husband. Over the objections of the defendants' counsel, Winsett was asked, and he answered, certain questions the answers to which showed that Winsett had forged the name of "Terry Patrick," a "local accountant," in a scheme by which he acquired from Stewart $68,000. He did so *808 under the representation that he was investing the money in bonds or securities; this representation was false, because in fact he placed the funds in his own investment account. As a result of this scheme, Winsett was, according to Life of Georgia, indicted in Georgia for the felony offense of "selling securities without a license, and, in 1993, he pleaded guilty." Brief of Appellant Life Insurance Company of Georgia, at 10.
The admission of evidence of this sort is controlled by Ala. R. Evid. 404(b), which states in pertinent part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake...."
The Alabama Rules of Evidence became effective on January 1, 1996. They are "modeled, except where a different treatment was deemed justified for Alabama practice, after the Federal Rules of Evidence." Ala. R. Evid. 102, committee notes. The language of Rule 404(b) is identical to that of its federal counterpart, which is applicable in both civil and criminal cases.
Under well-established Alabama practice, "[e]vidence of similar fraudulent acts [is] admissible to prove an alleged fraudulent scheme." Ex parte Georgia Cas. & Sur. Co., 531 So.2d 838, 841 (Ala.1988). Otherwise stated, evidence of collateral fraudulent acts is relevant and admissible for punitive damages purposes to demonstrate "a pattern or practice of fraud." Foremost Ins. Co. v. Parham, 693 So.2d at 428; Valentine v. World Omni Leasing, Inc., 601 So.2d 1006 (Ala.Civ.App.1992); see, also, Ex parte State Farm Mut. Auto. Ins. Co., 452 So.2d 861, 863 (Ala.1984); Dorcal, Inc. v. Xerox Corp., 398 So.2d 665, 671 (Ala.1981) ("In fraud cases, where intent, knowledge and scienter constitute essential elements of the offense, evidence of similar frauds and misrepresentations [is] commonly admissible.")
This is true, provided, of course, that the collateral acts evidencing a pattern or practice are "substantially of the same character [and] contemporaneous in point of time, or nearly so." Great American Ins. Co. v. Dover, 221 Ala. 612, 614, 130 So. 335, 336 (1930) (emphasis added). Thus, Alabama practice does not require that the collateral acts be functionally identical to the conduct or misrepresentation forming the basis of the action. Ex parte Rowland, 669 So.2d 125, 127 (Ala.1995); Valentine, 601 So.2d at 1009; Shoals Ford, Inc. v. McKinney, supra. "`[C]onduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Youngblood v. Lawyers Title Ins. Corp., 746 F.Supp. 71, 72 (S.D.Ala.1989) (emphasis added), rev'd on other grounds, 923 F.2d 161 (11th Cir.1991). On the basis of these principles, we conclude that the trial court did not err in allowing the jury to consider Winsett's fraudwhich he admittedin connection with his handling of the Kathy Stewart account in Georgia.
Common threads run throughout the pattern-or-practice evidence admitted in these cases. The plaintiffs' cases are based not only on theories of fraud in the inducement, but also on theories of fraud in the factum. According to these theories, especially the latter, Winsett engaged in a pattern of conduct by which he used his position with Life of Georgia to profit through various methods of subterfuge, including outright forgery. A factual issue fundamental to each plaintiff's case was how she was able to purchase an insurance policy from Winsett without learning the true nature of her purchase, that is, that it was, in fact, an insurance policy.
As a principal defense aimed at negating the reliance element of the plaintiffs' fraud claims, Life of Georgia argued at the trial that, regardless of any oral representations made, it had fully apprised the plaintiffs that they were buying insurance. It did so, it contended, by written material it issued in connection with each purchase. This material included forms entitled: (1) "Application for Insurance to Life Insurance Company of Georgia" and (2) "Policy Delivery Receipt." *809 Each form required the signature of the respective plaintiff.
As to the signature on her application form, Christina Smith testified: "It appears to be my signature but I never signed this." (Emphasis added.) Vanche testified that the signature on the application form purporting to be the one she signed "look[ed] like" her signature, but that she had no recollection of ever seeing, or signing, an application form. Moreover, she testified that she customarily dated everything she signed, and that the date next to the signature purporting to be hers was not in her handwriting. Janelle Smith testified that the signature on her application form "appear[ed] to be" her signature, but that she had never seen the upper portion of the application, that is, the portion bearing the words, "Application for Insurance to Life Insurance Company of Georgia." She testified that when she supplied the information for the application, the top portion "was covered." Green testified that she signed an application form, but that she did not know what she was signing, because, she stated, when the document was presented for her signature, the upper portion was "folded over or ... covered up." Duffee also testified that the signature on her application form "look[ed] like" her signature, but that she did not see the upper portion of the application, because when she supplied the information the top portion "was covered."
The record contains copies of "Policy Delivery Receipts" purporting to show that policies had been delivered to two of the plaintiffs, namely, Christina Smith and Janelle Smith. Both policy receipts are signed. However, Christina Smith testified: "That looks like my signature, but I never signed a policy receipt." (Emphasis added.) Janelle Smith testified that she never received a copy of her policy, and, regarding the signature on the policy receipt, she stated: "It appears to be my signature, but I don't ever recall signing anything like this." This testimony placed the validity of crucial signatures squarely in issue, and it was material to the plaintiffs' claims alleging fraud in the factum.
The materiality of this evidence was reinforced by Winsett's admissions of a number of collateral forgeries. Specifically, Winsett admitted during the trial that in August 1992 he had forged the signatures of female employees of Gulf Coast Therapy, located in, or around, Mobile, Alabama, on four Life of Georgia insurance application forms. The record is unclear as to whether these employees had, in fact, ever been contacted by Life of Georgia agents or employees regarding insurance. Winsett forged their names on insurance applications merely to present to Life of Georgia an artificially inflated sales volume. He explained the reasons for those forgeries, as follows:
"They were holdingevery year we had a push, in September they used to call it the September campaign, then they started calling it the fall campaign because it started getting longer and longer. And that's when they wrote the bulk of their business and there was a lot of pressure to produce business and thosebut the applications were held in the district office for several weeks to be sent in and we produced those applications one week for the purpose of that contest, but they were never sent to the home office."
(Emphasis added.)
Forgery is a species of fraud in the factum. First City, Texas-Beaumont, N.A. v. Treece, 848 F.Supp. 727, 738 (E.D.Tex. 1994); Bennion Ins. Co. v. 1st OK Corp., 571 P.2d 1339, 1341 (Utah 1977); Commonwealth Land Title Ins. Co. v. Nelson, 889 S.W.2d 312, 320-21 (Tex.App.1994); Akins v. Vermast, 150 Or.App. 236, 945 P.2d 640 (1997). Testimony regarding the Gulf Coast Therapy forgeries clearly was material as evidence of a pattern practiced by Winsett to inflate his sales account through forgery and as closely related examples of fraud in the factum. Forgery and concealment of critical portions of documents are species of fraud in the factum that form the elements in common among the transactions necessary to render the evidence admissible. The Stewart forgery was fraud of this same genre.
The fact that these instances of fraud post-dated the events on which the plaintiffs' claims are based does not bar the evidence of these instances. Where it is *810 material, evidence of collateral conduct may be admitted even though the collateral conduct occurred after the transactions forming the basis of the plaintiff's claims. See C. Gamble, McElroy's Alabama Evidence § 69.01(1) (5th ed.1996).
Life of Georgia and Winsett also contend that evidence of the Stewart fraud was inadmissible, because, they argue, Alabama juries may not consider conduct that occurred outside Alabama when they are deciding whether to award punitive damages to punish for conduct that occurred within Alabama. For that proposition, they cite BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), reversing 646 So.2d 619 (Ala.1994), on remand, 701 So.2d 507 (Ala.1997). Their reliance on Gore for this principle is misplaced.
The dispute involved in Gore arose out of the purchase by Dr. Ira Gore, Jr., of a 1990 BMW automobile. 646 So.2d at 621. Approximately nine months after the purchase, Dr. Gore discovered that while it was en route to America from Germany the automobile had been damaged by acid rain and, as a consequence, had been "partially refinished." Id. Complaining that the fact of the damage and the repair had not been disclosed to him at the time of the purchase, Dr. Gore sued the German manufacturer; BMW of North America, Inc. ("BMW"), the North American distributor; and others, seeking compensation based on claims of "fraud, suppression of a material fact, and breach of contract." Id. at 622.
At trial, evidence revealed that BMW "had adopted a company policy that it would not disclose any damage to a dealer or to a customer if the cost of repairing the damage was less than three percent of the manufacturer's suggested retail price." Id. at 621. It further revealed that BMW had sold approximately 1,000 partially refinished vehicles in the United States under similar circumstances. Id. at 627. Dr. Gore's counsel argued to the jury:
"`They've taken advantage of nine hundred other people on those cars that were worth more.... If what Mr. Cox said is true, they have profited some four million dollars on those automobiles. Four million dollars in profits that they have made that were wrongfully taken from people. That's wrong, ladies and gentlemen. They ought not be permitted to keep that. You ought to do something about it.
"`....
"`I urge each and every one of you and hope that each and every one of you has the courage to do something about it. Because, ladies and gentlemen, I ask you to return a verdict of four million dollars in this case to stop it.'"
Id. (emphasis added). Responding to the plaintiff's argument, the jury returned a verdict against BMW in the amount of $4,000,000 in punitive damages.[4]
On appeal, this Court acknowledged "that the jury's punitive damages award [was] based upon a multiplication of $4,000 (the diminution in value of the Gore vehicle) times 1,000 (approximately the number of refinished vehicles sold in the United States)." Id. We stated:
"[T]he award of punitive damages was based in large part on conduct that happened in other jurisdictions.... Although evidence of similar acts in other jurisdictions is admissible as to the issue of a `pattern and practice' of such acts ..., this jury could not use the number of similar acts that a defendant has committed in other jurisdictions as a multiplier when determining the dollar amount of a punitive damages award. Such evidence may not be considered in setting the size of the civil penalty, because neither the jury nor the trial court had evidence before it showing in which states the conduct was wrongful."
Id. (emphasis in original). Although we did, consequently, order a remittitur of the verdict, we conditionally affirmed a judgment in the amount of $2,000,000. Id. at 629.
In the United States Supreme Court, "Dr. Gore argued that the large punitive damages award was necessary to induce BMW to change [its] nationwide policy." 517 U.S. at *811 572, 116 S.Ct. 1589 (emphasis added). More specifically, he stated:
"If Alabama were limited to imposing punitive damages based only on BMW's gain from fraudulent sales in Alabama, the resulting award would have no prospect of protecting Alabama consumers from fraud, as it would provide no incentive for BMW to alter the unitary, national policy of nondisclosure which yielded BMW millions of dollars in profits."
Id. at 572 n. 18, 116 S.Ct. 1589 n. 18.
The Supreme Court rejected Dr. Gore's arguments, particularly noting the absence of any evidentiary "basis for Dr. Gore's contention that BMW could not comply with Alabama's law without changing its nationwide policy." Id. It also agreed with this Court that the punitive damages award should have been based "solely on conduct that occurred within Alabama." Id. at 573-74, 116 S.Ct. 1589. That conclusion, however, was based on a principle that provides no support for Life of Georgia and Winsett.
In a thorough jurisdictional survey, the Supreme Court listed 24 states that had enacted statutes requiring disclosure of pre-purchase damage in an amount only exceeding the amount of the damage to Dr. Gore's automobile. Id. at 567-70 n. 13, 116 S.Ct. 1589 n. 13.[5] The Court explained that "principles of state sovereignty and comity" prohibit "a State [from] impos[ing] economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." Id. at 572, 116 S.Ct. 1589 (emphasis added). It stated, in other words, that "Alabama [did] not have the power ... to punish BMW for conduct that was lawful where it occurred." Id. at 572-73, 116 S.Ct. 1589 (emphasis added).
The Supreme Court, however, clearly distinguished between the right of a state to enhance a tortfeasor's punishment based on extra-territorial, lawful, conduct from the right to enhance punishment based on extra-territorial, un lawful, conduct. More specifically, the Supreme Court explained:
"Our cases concerning recidivist statutes are not to the contrary. Habitual offender statutes permit the sentencing court to enhance a defendant's punishment for a crime in light of prior convictions, including convictions in foreign jurisdictions.... A sentencing judge may even consider past criminal behavior which did not result in a conviction and lawful conduct that bears on the defendant's character and prospects for rehabilitation.... But we have never held that a sentencing court could properly punish lawful conduct. This distinction is precisely the one we draw here."
Id. at 573 n. 19, 116 S.Ct. 1589 n. 19 (emphasis in original). The Court further stated:
"Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law. ... Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance."
Id. at 576-77, 116 S.Ct. 1589 (emphasis added).
Although the United States Supreme Court reversed this Court's judgment in Gore, 517 U.S. at 586, 116 S.Ct. 1589, its opinion affords no support for the proposition urged by Life of Georgia and Winsett. On the contrary, it constitutes a most effective rebuttal. This is so because forgery is un lawful in every American jurisdiction, so far as we are aware. Certainly, the Stewart fraud was unlawful conduct in Georgia, as is evidenced by Winsett's felony conviction, which was based on that conduct. Thus, the trial court did not abuse its discretion in admitting evidence of Winsett's conduct in Georgia regarding the Stewart fraud.

V. Conclusion

We reverse the judgments entered on the jury verdicts for the plaintiffs and remand these cases for a new trial. In the new trial, the court shall apply the new rule of law we *812 have announced in this opinion with regard to the relationship between awards of nominal damages, compensatory damages, and punitive damages.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, SEE, and LYONS,[*] JJ., concur.
SHORES, J., concurs in the result.
HOUSTON, J., concurs in the rationale in part and concurs in the result.
ALMON, J., concurs in the rationale in part but dissents from the judgment.
COOK, J., concurs in part and dissents in part as to the rationale and dissents from the judgment.
KENNEDY, J., dissents.
HOUSTON, Justice (concurring in the rationale in part and concurring in the result).
These cases are clearly distinguishable from The Booth, Inc. v. Miles, 567 So.2d 1206 (Ala.1990); First Bank of Boaz v. Fielder, 590 So.2d 893 (Ala.1991); Shoals Ford, Inc. v. McKinney, 605 So.2d 1197 (Ala.1992); Caterpillar, Inc. v. Hightower, 605 So.2d 1193 (Ala.1992); and Garrett v. City of Auburn, 623 So.2d 1033 (Ala.1993). It is possible that the present cases might fit into the following dicta in my opinion in First Bank of Boaz v. Fielder, 590 So.2d 893, 899-900:
"[A] survey of our cases reveals that the focus of this Court has been on the sufficiency of the evidence to support a finding by the jury that the plaintiff has been injured, at least nominally, and that the defendant deserves to be punished via an award of punitive damages. It would certainly be illogical, in a case where the jury was properly charged that it could punish the defendant for aggravated misconduct that caused the plaintiff injury and where the evidence supported an award of punitive damages, for the defendant to be freed of responsibility for that aggravated misconduct by the fortuitous circumstance that the jury failed to award either compensatory or nominal damages because the plaintiff failed to prove that he was entitled to compensatory damages and the jury was not charged on or otherwise did not award nominal damages; the plaintiff's injury was incapable of precise monetary measurement and the jury was not charged on or otherwise did not award nominal damages...."
(Emphasis added.) However, the two examples mentioned in these dicta in First Bank of Boaz were not intended to do away with the requirement stated in the first sentence quoted, that this Court be able to clearly ascertain from the record that the jury, in fact, found that the plaintiff had been injured. Based upon the jury instructions given by the trial court in these present cases, I conclude that the verdicts were inconsistent and must be set aside.
Injury is an element of the plaintiffs' causes of action, and it was the responsibility of the plaintiffs to assure that the jury was properly instructed on all elements of their causes of action. The trial court was not asked to instruct the jury on nominal damages. The trial court instructed the jury as follows:
"If you are reasonably satisfied from the circumstantial evidence that the Defendants were guilty of fraud as claimed by the Plaintiff and that the Plaintiff was damaged thereby, then the Plaintiff would be entitled to recover for such actual damage as you find from the evidence they did suffer.

"....
"Compensatory are actual damages [and] are allowed and should be awarded for where the Plaintiffs reasonably satisfy the jury from the evidence that the Plaintiffs have been injured or damaged as a proximate result of acts on the part of the Defendants or the Plaintiffs reasonably satisfied the jury from evidence that the Plaintiffs have been willfully or wantonly injured by the Defendants [sic].
"....

*813 "The purpose of awarding compensatory damages is to fairly and reasonably compensate the injured party for the loss or injury sustained.
"Compensatory damages are intended as money compensation to the party wrong[ed] to compensate him for his injury and other damages which have been inflicted upon him as [a] proximate result of the [wrong] complained of.
"In addition to damages the law authorizes a jury to award punitive or exemplary damages in fraud or deceit actions if it is shown by clear and convincing evidence that the fraud and deceit were the intentional misrepresentation, deceit, or concealment of a material fact that conceal[ing] party had a duty to disclose which was gross, oppressive, or malicious and committed with the intention on the part of the Defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury.
"....
"If you are reasonably satisfied that the Defendant has been shown by clear and convincing evidence to be guilty of an intentional misrepresentation, deceit, or concealment of a material fact that the Defendant had a duty to disclose which was gross, oppressive, malicious or committed with the intention on the part of the Defendant of thereby depriving the Plaintiff of property [or] legal rights or otherwise causing injury and the Plaintiff did suffer injury or damage as a proximate result of such fraud or deceit, then in your discretion you may award the Plaintiff punitive damages in addition to any actual damages you find from the evidence that Plaintiff did suffer."
(Emphasis added.)
After the jury had retired, the jurors asked the trial court to reinstruct them as to the difference between compensatory damages and punitive damages. The trial court then gave the following instruction:
"THE COURT: ... Jurors, I have received your question and you are saying you would like for me to tell you the difference between compensatory and punitive damages and I have discussed this with the attorneys and I'm going to read to you the jury charges that were presented to you previously to the difference between those two types of damages.
"It says compensatory are actual damages [and] are allowed in and should be awarded where the Plaintiffs reasonably satisfy the jury from the evidence that the Plaintiffs have been injured or damaged as the proximate result of the act on the part of the Defendants or where the Plaintiffs reasonably satisfy the jury from the evidence that the Plaintiffs have been willfully or wantonly injured by Defendants."
(Emphasis supplied.)
The trial court never defined "injury"; however, as shown by the instructions quoted above, it did equate the existence of injury with entitlement to compensatory damages. I also note that in another portion of its charge the trial court instructed the jury that it could "award [the plaintiffs] damages whether compensatory or punitive or both." It does not appear that the defendants objected to this instruction or to the other instructions set out above. The jury awarded no compensatory damages; therefore, based on this record, I am left to speculate as to whether this jury actually found an injury or, instead, impermissibly punished the defendants without that necessary finding. For this reason, I believe the verdicts must be set aside as being inconsistent; therefore, I would hold the trial court erred in not setting the verdicts aside and granting a new trial. City of Bessemer v. Foreman, 678 So.2d 759 (Ala.1996).
With the exception of its discussion of First Bank of Boaz and its progeny, I concur with the per curiam opinion. It may be that the rule enunciated in the First Bank of Boaz line of cases is too broad; however, given the jury instructions in the present cases, I find it unnecessary to reach that issue at this time. Therefore, as to the discussion of the issue relating to the inconsistency of the verdicts, I concur only in the result.
ALMON, Justice (concurring in the rationale in part but dissenting from the judgment).
I respectfully dissent from the reversal of the judgments and the order for a new trial *814 on the plaintiffs' claims. I agree with portions of the reasoning of the per curiam opinion. In particular, I concur with the per curiam opinion to the extent that it reinstates the rule of O.K. Bonding Co. v. Milton, 579 So.2d 602 (Ala.1991), and is consistent with my dissent in Caterpillar, Inc. v. Hightower, 605 So.2d 1193, 1196-97 (Ala.1992). For the reasons explained below, however, I would affirm the judgments rather than reversing them and remanding the cases for a new trial.
The per curiam opinion reverses the judgments for four of the plaintiffs based on a conclusion that the limitations period had run as to certain aspects of those plaintiffs' claims alleging, as to Life Insurance Company of Georgia, negligent or wanton hiring, training, and supervision of its agent Garry Winsett. However, I do not think reversal is appropriate, given the posture of these appeals.
A continuous tort may produce some injury at its inception and some injury later. In such cases, it may happen that the injured person files an action more than two years after the initial act causing injury (assuming two years to be the period of limitations, as is the case here; see Ala.Code 1975, § 6-2-38). In such a case, the statute of limitations may bar the recovery of damages based on that portion of the injury caused by conduct occurring more than two years before the filing of the complaint, but it would not bar the recovery of damages based on injuries caused by conduct occurring within those two years. See Mardis v. Robbins Tire & Rubber Co., 669 So.2d 885 (Ala.1995); Continental Cas. Ins. Co. v. McDonald, 567 So.2d 1208 (Ala.1990).
However, in such a case, it is the defendant's burden to request that the jury be instructed to award damages only in regard to the conduct that occurred within the period of limitations. Continental Cas. Ins. Co. v. McDonald, supra. Life of Georgia and Winsett have argued only that the circuit court erred in denying their motions for a summary judgment and for a judgment as a matter of law on the claims alleging negligent or wanton hiring, training, or supervision. As the per curiam opinion correctly holds, the evidence would support a finding that, within the two years before these four plaintiffs filed their complaints in September 1993, Life of Georgia was wanton in its supervision of Winsett. After the circuit court denied its preverdict motion for a judgment as a matter of law, Life of Georgia did not request a jury instruction limiting the negligent/wanton supervision claim to the two-year period before September 1993.
I agree with the per curiam opinion that the motion for judgment as a matter of law was correctly denied as to the negligent/wanton supervision claim. However, I see no basis for reversing the judgments on the verdicts and remanding for a new trial based on an inference that part of the punitive damages may have been based on the wanton supervision claim but on conduct occurring more than two years before these four complaints were filed. The per curiam opinion is holding the circuit court to have erred, based on a theory that was not presented to that court. I would reject Life of Georgia's argument that the circuit court erred in denying its motion for a judgment as a matter of law on the allegation of negligent or wanton supervision of Winsett.
Furthermore, I would not reverse the judgments based on an overruling of First Bank of Boaz v. Fielder, 590 So.2d 893 (Ala. 1991), Caterpillar, Inc. v. Hightower, 605 So.2d 1193 (Ala.1992), Shoals Ford, Inc. v. McKinney, 605 So.2d 1197 (Ala.1992), and Garrett v. City of Auburn, 623 So.2d 1033 (Ala.1993). Although I disagreed with those cases (see my dissenting opinion in Caterpillar, 605 So.2d at 1196-97; I dissented without writing in Shoals Ford, and I did not vote in First Bank of Boaz and Garrett), they established the law that was applicable to these present actions. Under the law at the time these cases were submitted to the jury, the circuit court did not err in denying the defendants' motions for a new trial based on the award of $0 compensatory damages and $200,000 punitive damages in each plaintiff's action. Moreover, when the jury returned *815 its verdicts awarding $0 compensatory damages and $200,000 punitive damages for each plaintiff, the court asked if there were "any matters that we need to address for the record," and the defendants' attorney answered "No." I would hold that, by failing to object before the jury was dismissed, the defendants waived any error in the form of the verdict. Furthermore, although I concur in the overruling of First Bank of Boaz, Caterpillar, Shoals Ford, and Garrett, I would make the overruling of those cases prospective only.
Because of the result the per curiam opinion reaches, it does not address Life of Georgia's argument that the circuit court erred in denying a remittitur of the punitive damages. I think the culpability of Life of Georgia and its agent, and the other factors that would be applicable to an analysis of the punitive damages awards, support the verdicts and the circuit court's decision not to interfere with them.
For the foregoing reasons, I would affirm the judgments. I concur in the overruling of those cases holding that a court may accept a verdict awarding $0 compensatory damages and yet awarding punitive damages, although I would make that holding prospective. To the extent that the per curiam opinion holds that the plaintiffs' fraud claims were properly submitted to the jury, and that the claims alleging negligence and wantonness were not entirely barred by the statute of limitations, I agree with the reasoning of the per curiam opinion. However, because the result reached by the per curiam opinion is to reverse the judgments, I dissent from this Court's judgment.
COOK, Justice (concurring in part and dissenting in part as to the rationale and dissenting from the judgment).
I concur in various aspects of this relatively complex per curiam opinion. However, that opinion goes far afield to reverse judgments I would affirm. For example, it erroneously overrules the line of well-reasoned cases represented by Garrett v. City of Auburn, 623 So.2d 1033 (Ala.1993); Caterpillar, Inc. v. Hightower, 605 So.2d 1193 (Ala.1992); Shoals Ford, Inc. v. McKinney, 605 So.2d 1197 (Ala.1992); and First Bank of Boaz v. Fielder, 590 So.2d 893 (Ala.1991). Equally troubling is the fact that the per curiam opinion is internally inconsistent. It provides the reader no workable explanation for the result it reaches. The inconsistencies will become apparent upon the following discussion illustrating my points of agreement, and my points of disagreement, with the per curiam opinion.

I. Points of Agreement

A. Tax Liability
First, I concur in the conclusion that the plaintiffs possess valid tax-liability claims against Life Insurance Company of Georgia ("LOG") and its agent Garry Winsett and that those claims are not barred by the statute of limitations. In order to understand the essence and the basis of these claims, the reader is likely to need a more thorough discussion of the applicable tax laws and the peculiar methods by which LOG and Winsett marketed, established, and operated these cafeteria plans than is provided in the per curiam opinion.
A cafeteria plan, as outlined in I.R.C. § 125, "is a separate written benefit plan maintained by an employer for the benefit of its employees, under which all participants are employees and each participant has the opportunity to select the particular benefits that he desires." [1996 Tax Terms] Stand. Fed. Tax Rep. (CCH) ¶ 1851. "A cafeteria plan may offer participants the opportunity to select among various taxable benefits and nontaxable benefits, but a plan must offer at least one taxable benefit and at least one nontaxable benefit." Id. Section 125 provides in pertinent part:
"(a) In general.Except as provided in subsection (b), no amount shall be included in the gross income of a participant in a cafeteria plan solely because, under the plan, the participant may choose among the benefits of the plan.

*816 "(b) Exception for highly compensated participants and key employees.
"....
"(3) Year of Inclusion.For purposes of determining the taxable year of inclusion, any benefit described in paragraph (1) or (2) shall be treated as received or accrued in the taxable year of the participant or key employee in which the plan year ends.
"....
"(d) Cafeteria plan defined.For purposes of this section
"(1) In general.The term `cafeteria plan' means a written plan under which
"(A) all participants are employees, and
"(B) the participants may choose among 2 or more benefits consisting of cash and qualified benefits.
"(2) Deferred compensation plans excluded.
"(A) In general.The term `cafeteria plan' does not include any plan which provides for deferred compensation.
"(B) Exception for cash and deferred arrangements.Subparagraph (A) shall not apply to a profit-sharing or stock bonus plan or rural cooperative plan (within the meaning of section 401(k)(7)) which includes a qualified cash or deferred arrangement (as defined in section 401(k)(2)) to the extent of amounts which a covered employee may elect to have the employer pay as contributions to a trust under such plan on behalf of the employee.
"(C) Exception for certain plans maintained by educational institutions.Subparagraph (A) shall not apply to a plan maintained by an educational organization described in section 170(b)(1)(A)(ii) to the extent of amounts which a covered employee may elect to have the employer pay as contributions for post-retirement group life insurance if
"(i) all contributions for such insurance must be made before retirement, and
"(ii) such life insurance does not have a cash surrender value at any time.
"For purposes of section 79, any life insurance described in the preceding sentence shall be treated as group-term life insurance."
26 U.S.C.S. § 125 (Supp.1997).
LOG described to employees, prospective insureds, its version of the § 125 cafeteria plan in a promotional publication entitled A Better Way to Look at Employee Benefits from Life of Georgia: Employee Guide ("Employee Guide"). The Employee Guide stated in part:
"WE CALL IT SUPERFLEX
"....
"Under SuperFlex, you and your employer agree that a portion of your salary will go into a special benefits fund called a Flexible Spending Account. You will use this account to pay health insurance premiums, out-of-pocket medical expenses, child and dependent care and other costs authorized by Section 125.
"Here's why both you and your employer are better offthe amount you contribute to the Flexible Spending Account is made with pre-tax dollars, so you owe no payroll taxes on it. Neither does your company."
(Emphasis added.)
Additionally, the Employee Guide described in tabular form how participation in LOG's version of the cafeteria plan could increase an employee's amount of "net take-home pay." Those tables described the advantages of participation as follows:

*817
"SUPERFLEX CASE STUDY
"Company Name: XYZ, Inc. # Employees: 25
"Client Name: Joe Rose Filing Status: Joint
"Male Age: 35
"Mode of Payment: Weekly # W-4 Exemptions: 3
 "WITHOUT SUPERFLEX WITH SUPERFLEX
"Gross Wages 400.00 400.00
"Employee Flexible Spending
 Account Contribution 0.00 96.23
 _______ _______
"Adjusted Gross Wages 400.00 303.77
"Payroll Taxes
 Federal Tax -34.33 -19.89
 State Tax -2.00 -1.52
 FICA -30.04 -22.81
 _______ _______
"Net Pay Before Deductions 333.63 259.55
"After-Tax Expenses
 Health Insurance -25.00 0.00
 Dental Insurance -5.00 0.00
 Out-of-Pocket Medical
 Expense -19.23 0.00
 Child Care -40.00 0.00
 Disability Insurance -7.00 0.00
"Administration Fees ? ?
"Net Take-Home Pay 237.40 259.55

"With SuperFlex, this employee takes home an extra $22.15 every single week$1151.80 for the full year.
"Health, dental and disability insurance premiums, out-of-pocket medical expenses and child care costs are paid from the employee's SuperFlex Spending Account." (Emphasis added.)
The concept of a "flexible spending account" ("FSA") was not a creation of LOG. On the contrary, FSAs are a feature of cafeteria plans, established "[f]or purposes of accounting." Weiler, Cafeteria Plans Add Flexibility to Benefit Programs While Keeping After-tax Costs Down, Tax'n for Law., Sept.-Oct.1987, at 69. "The accounts are increased by ... salary reductions as such amounts are withheld from compensation.... The accounts are reduced as ... reimbursements for covered expenses are claimed." Id. "While Federal ... taxes ... are not withheld from ... salary reductions..., the taxability of such amounts depends upon the application of such amounts and is the responsibility of each plan participant." Id. (Emphasis added.) "Thus, ... an employee who ... claims a reimbursement for... expenses in excess of the applicable limit will owe additional taxes on such excess amount." Id. (Emphasis added.)
The Employee Guide also contained a series of questions and answers purporting to explain the function of the FSA. It stated, in part:
"Q. What expenses can be paid from my Flexible Spending Account?
"A. Insurance Premiumsmedical, dental, disability, group term life, other indemnity plans such as cancer coverage, in-hospital, accident, Medicare Supplement, income replacement.
"Medical Expenses Not Reimbursed By Insurancedeductibles and co-payments, checkups, school physicals, OB-GYN exams, travel expenses to obtain health care, prescriptions and medications including birth control, dental exams and X-rays, *818 orthodontic services, eye exams and treatment, glasses and contact lenses, psychological treatment, chiropractic services, non-smoking program, weight loss program, cosmetic surgery.
"Child and Dependent CareDaycare for children, care for dependent adults.
"....
"Q. How do I know how much money to transfer from salary into my Flexible Spending Account each year?
"A. Life of Georgia provides a step-by-step worksheet for you to review family expenses in the eligible categories paid during the previous year. This is the amount that you should put into the Account to cover eligible expenses in the current year.
"Q. What happens if funds are left in the Account at year's end?
"A. Unused funds revert to your employer at the end of the year ... so it is very important to estimate expenses carefully.
"Q. What happens if the federal law changes?
"A. SuperFlex will change right along with it ... and your benefits will remain fully protected and fully legal.
"Q. Who will manage my Flexible Spending Account?
"A. A professional administrator selected by your company. The administrator keeps your account up to date at all times. Whenever you have claims, the administrator processes them and reimburses you for eligible expenses."[6]
(Emphasis in original). During the application process, each employee completed a "Flexible Benefit Plan Survey," listing the expenses to which the Employee Guide referred (" § 125 expenses").
However, these plaintiffs' plans, as actually established, bore not even a nominal resemblance to the representations in the Employee Guide. It is undisputed that all of these plans were established without FSAs, and, from what I can discern from the record, without an "administrator" to administer them. Thus, report forms, which were required by the IRS to be filed annually in connection with § 125 plans, were never filed. Evidence clearly demonstrated that Winsett established many, if not all, his cafeteria plans in this manner.
Some of the most cogent testimony as to how Winsett established the cafeteria plans can be obtained from documents filed in other actions pending in this state involving LOG and Winsett. For example, Nichols v. Life Insurance Co. of Georgia, 701 So.2d 1126 (Ala.Civ.App.1997), like this case, involved cafeteria plans established by Winsett and an associate agent, Richard Bohlken,[7] for Robert Nichols, Flemon Jones, and Adrian Pound, employees of Dean Brothers, Inc., "an automobile parts/salvage business." Id. at 1128. The Court of Civil Appeals described the procedure as follows:
"In or around late 1990, Winsett and Bohlken contacted Dean Brothers Inc., an automobile parts/salvage business, regarding the establishment of a § 125 `cafeteria plan' for the company and its employees.... Winsett and Bohlken informed Dean Brothers that the cafeteria plan would allow Dean Brothers employees to pay for certain qualified expenses with pre-tax dollars; their doing so would, in turn, save the company and the employees *819 money and would provide the employees with retirement benefits. Winsett and Bohlken informed Dean Brothers that the cafeteria plan was legal, that Life of Georgia would take care of all the paperwork, and that the plan could be instituted at no cost to the company.
"After Dean Brothers agreed to establish a cafeteria plan, Winsett and Bohlken advised the Dean Brothers employees concerning which expenses qualified under the cafeteria plan, assisted the employees in computing those expenses, and adjusted the Dean Brothers payroll system for the cafeteria plan deductions. Winsett and Bohlken conducted individual meetings with each employee, including Jones, Nichols, and Pound, wherein they showed each how much money they would save if they participated in the cafeteria plan.... The employees testified by deposition that Winsett and Bohlken told them that if they participated in the cafeteria plan they would secure a retirement account and would receive an insurance policy as a bonus and that, based on these representations, the employees agreed to participate in the plan.
"In December 1992, the Internal Revenue Service notified Dean Brothers that it owed a $6,875 penalty for the late filing of a required form for the cafeteria plan. Dean Brothers sued Life of Georgia in February 1994, alleging that Life of Georgia was responsible for the failure to file the form; the case was settled in October 1995.
"Pursuant to 26 U.S.C. § 125, a cafeteria plan must have a written plan document and an established `flexible spending account.' Under a `flexible spending account' system, each employee estimates his expenses for the upcoming year, and then each pay period the employee subtracts a pro rata portion of this amount from his gross income and deposits this amount into a flexible spending account.... For example, when the employee visits a doctor and incurs a medical expense, he then submits a receipt to the plan administrator and is reimbursed from the flexible spending account tax-free....
"Instead of establishing a `flexible spending account,' Winsett established what is typically called an `advanced reimbursement system.' Under this system, Winsett altered Dean Brothers' payroll system to subtract the § 125 expenses from the employee's paycheck before taxes were taken out. Taxes were then computed on the reduced income amount, and any untaxed § 125 portion was added back to the employee's paycheck without regard to whether the employee had incurred the expenses or had submitted a receipt.
"Under the `advanced reimbursement system,' Life of Georgia could generate immediate, increased take-home pay for the employee. This allowed the employees to enjoy the increased net income each pay period regardless of whether they ever incurred any medical expenses. This system allowed Life of Georgia to sell the Dean Brothers employees a universal life insurance policy with the payment coming from the employee's savings. The employees, however, testified by deposition that Winsett and Bohlken did not tell them that they were buying life insurance, but instead told them that the money was going into a retirement plan that was part of the cafeteria plan. The employees stated that they were told that the retirement plan was unrelated to the insurance policy, and that the insurance policy was an extra bonus.
"In May 1994, Nichols, Jones, and Pound sued Life of Georgia, Winsett, and Bohlken, alleging fraud. The fraud claim was based on the alleged misrepresentations made to the Dean Brothers employees concerning the validity of the cafeteria plan and the misrepresentation that if they participated in the plan they would secure a retirement plan and receive an insurance policy as a bonus, when, in fact, all they received was a life insurance policy."[8]
701 So.2d at 1128-29 (emphasis added).
Further explanation for the way in which Winsett and LOG operated these plans is *820 offered by Mike Contorno in an affidavit he submitted on July 28, 1995, in a similar case, styled Contorno, Inc. v. Life Insurance Company of Georgia.[9] That affidavit states in pertinent part:
"I, Mike Contorno, swear and affirm that I am President and stockholder in Contorno, Inc., and have personal knowledge of the facts contained in this Affidavit.
"In or around the Spring of 1991, Garry Winsett approached Contorno, Inc., and represented that his company, Life of Georgia, would establish a cafeteria plan for Contorno, Inc., that would save the company and its employees money by reducing tax liability through the payment of certain qualified expenses with pre-tax dollars. Mr. Winsett further represented that the cafeteria plan would be instituted at no cost to the company, and that Life of Georgia would take [care] of the paper work. Mr. Winsett further represented that Life of Georgia would also establish a retirement plan for the company's employees by investing a proportion of the tax savings into a retirement account. Based on these representations, Contorno, Inc., allowed Life of Georgia to establish a cafeteria plan and a retirement account for its employees.
"After agreeing that Life of Georgia could establish a cafeteria plan, Mr. Winsett, as an agent of Life of Georgia, represented to Contorno that its employees could estimate their medical expenses for the upcoming year and reduce their taxable income by the amount of their estimated medical expenses while increasing each employee's take home pay. Mr. Winsett never informed Contorno that it was necessary to establish a special checking account to deposit the estimated expenses, and to require receipts from the employees prior to reimbursing any expenses. Instead, Mr. Winsett assisted the company in setting up its payroll system where the estimated expenses were taken from the employees' gross pay prior to the computation of payroll and income taxes. The estimated expenses were then placed back into each employee's pay as part of his or her paycheck, after the taxes were deducted. Not only did Mr. Winsett represent that the cafeteria plan was legal and proper under the rules and regulations of the Internal Revenue Service, he assisted the company's employees in completing the necessary forms.
"During the last few months, it has come to the attention of Contorno, Inc., that Garry Winsett misrepresented virtually every fact concerning the establishment of a cafeteria plan and a retirement account. Contorno, Inc., in fact, never had a cafeteria plan document, nor any other documents that would evidence the establishment of a cafeteria plan. Life of Georgia also promised to hire a plan administrator to administer the cafeteria plan, however, to the best of my knowledge a plan administrator was never hired. The required Form 5500 tax returns were never filed.
"Contorno, Inc., has also discovered that the proceeds provided to Life of Georgia were not being paid into any retirement account, but were paying for life insurance policies. No retirement accounts were ever established and this entire story was created by Garry Winsett to hide the fact that he was merely selling life insurance."
(Emphasis added.)
As Nichols pointed out, the procedure established by Winsett allowed LOG to "generate immediate, increased take-home pay for the employee." 701 So.2d at 1129. This "increased take-home pay" was, in practice, then transformed directly into premium payments to LOG for universal life insurance. The procedure facilitated the purchase of universal life insurance with § 125 pre-tax dollars.
However, § 125(d)(2)(A) expressly states that "any plan which provides for deferred compensation" cannot be defined as a cafeteria *821 plan, and § 125(d)(2)(C)(ii) expressly excepts "life insurance" that has "a cash surrender value at any time." This restriction is more fully explained in Prop. Reg. § 1.125-2, ¶ 1253.01, A-5(a), 4 U.S. Tax Rep. (RIA 1997):
"A cafeteria plan may not include any plan that offers a benefit that defers the receipt of compensation. In addition, a cafeteria plan may not operate in a manner that enables employees to defer compensation. For example, a plan that permits employees to carry over unused elective contributions or plan benefits (e.g., accident or health plan coverage) from one plan year to another operates to defer compensation. This is the case regardless of how the contributions or benefits are used by the employee in the subsequent plan year (e.g., whether they are automatically or electively converted into another taxable or nontaxable benefit in the subsequent plan year or used to provide additional benefits of the same type). Similarly, a cafeteria plan operates to permit the deferral of compensation if the plan permits participants to use contributions for one plan year to purchase a benefit that will be provided in a subsequent plan year (e.g., life, health, disability, or long-term care insurance coverage with a savings or investment feature, such as whole life insurance). For example, a cafeteria plan operates to permit the deferral of compensation if the cafeteria plan includes a health plan that is a flexible spending arrangement... and such health plan may reimburse participants premium payments for other accident or health coverage extending beyond the end of the plan year."
(Emphasis added.)[10] The phrase "deferred compensation" "includes any amounts includable in gross income as compensation for personal services pursuant to a plan, or method having the effect of a plan, deferring the taxation of such payment to a taxable year later than that in which such services were rendered." 26 C.F.R. § 1.1348-3 (1997).
It is undisputed that these life insurance policies accumulated cash value. Ronald Wallace, who was "district manager" for LOG in 1995, testified that such "[l]ife insurance premiums cannot be paid for with pre-tax dollars." Indeed, the Employee Guide specifically describes the type of insurance coverage that can be included within the plan, namely, "medical, dental, disability, group term life, other indemnity plans such as cancer coverage, in-hospital, accident, Medicare Supplement, [and] income replacement." (Emphasis added.) Significantly, no reference is made to cash-value life insurance of the type sold to these employees.
In deducting SuperFlex premiums from the plaintiffs' paychecks on the basis of estimates of dollars "saved" by pre-tax deductions, see Employee Guide tables, and adding the amount of the estimated savings back into the plaintiffs' paycheck "after the taxes were deducted," see Contorno affidavit, LOG induced the plaintiffs to "use contributions for one plan year to purchase a benefit," namely, accrued cash value, that would "be provided in a subsequent plan year." Prop. Reg. § 1.125-2, ¶ 1253.01. Thus, the manner in which LOG established its "SuperFlex cafeteria plans" allowed the plaintiffs to defer compensation in violation of § 125(d)(2), rendering, therefore, each plan invalid on its face.
Noncompliance with § 125 results, of course, in the accrual of tax liability for participants in the invalid plan. Weiler, supra, at 69. More specifically, tax liability accrued with every filing by the employee of a tax return that was defective because of her participation in the invalid SuperFlex cafeteria plan. See Jackson v. Secor Bank, 646 So.2d 1377 (Ala.1994), in which this Court affirmed a summary judgment in favor of Secor Bank against Albert Jackson on statute-of-limitations grounds.
The cause of action in Jackson arose out of an error committed by Secor Bank in 1987 that resulted in the placement of Jackson's funds into an account that was not a "qualified tax deferred account," as he had directed. *822 Id. at 1377-78. When Jackson filed his 1987 federal tax return, he failed to report as taxable income $281 interest that had accrued in the nonqualified account. Id. at 1378. In Jackson's subsequent action against Secor Bank, which presented various tort theories, the trial court, and this Court, held that Jackson's cause of action accrued when he filed a defective tax return. Id. at 1379. This Court stated:
"The trial judge properly concluded that Jackson incurred an injury or damage'a liability of admittedly, an unknown amount, but it was a liability which is a damage'more than two years before he filed his complaint. Jackson clearly suffered damage when he filed his 1987 federal income tax return on April 14, 1988. There was no doubt that on that date Jackson was legally obligated to pay taxes on the funds he had deposited into the [nonqualified] account."
Id. at 1379-80 (emphasis added). See also Jones v. Blanton, 644 So.2d 882, 887 (Ala. 1994) ("A cause of action `accrues' when a party suffers an injury or a loss or damage entitling her to maintain an action.")
Because the SuperFlex cafeteria plan in each of these cases was defective on its face, the fact of injury was clear in each instance.[11] It is immaterial that the full extent of tax liability was unknown when these plaintiffs filed their defective returns, or when they filed the complaints commencing these actions. These actions are, therefore, within the rule set forth in the Fielder-Hightower line of cases, supra, holding that a verdict awarding only punitive damages is, nevertheless, sustainable if the fact of injury to the plaintiff is "clear" in the record, or is "uncontroverted." Hightower, 605 So.2d at 1195. Thus, the punitive damages awards in these present cases are not invalidated by the jury's failure to award compensatory damages.
Applying a similar analysis, I conclude that the statute of limitations did not bar the tax-liability claims. As I have already pointed out, the plaintiffs incurred definite tax liability with every filing of a defective tax return. Causes of action accrued on the filing dates of those returns.
The record does not indicate the dates on which the plaintiffs actually filed their 1991 federal tax returns. I am certain, however, that their returns, which were due by April 15, 1992, were not filed before December 31, 1991the end of the 1991 tax year. Therefore, the complaints of Vanche, the Smiths, and Duffee, which were filed on September 9, 1993, were filed well within the two-year statute-of-limitations period. LOG is not entitled to a reversal on the limitations ground.

B. Fraud and Extrinsic Evidence
I also agree with the per curiam opinion that the trial court properly submitted the fraud claims to the jury. As that opinion states, the plaintiffs presented substantial evidence indicating that "Winsett actively and repeatedly misinformed [the plaintiffs] of the nature of the product they had purchased, thus tolling the limitations period on the fraud claims." 719 So.2d at 802. Moreover, I concur in Part IV of the per curiam opinion, addressing the defendants' objections to "extrinsic evidence."

C. Negligent/Wanton Hiring and Supervision
I also agree with the per curiam opinion that claims of negligent and wanton supervision are continuing torts and that the plaintiffs presented substantial evidence to support these claims against LOG based on the conduct of Winsett. However, it is at this point that my agreement with the per curiam opinion ends.

II. Points of Disagreement

A. Statute of Limitations
As I have already stated, the per curiam opinion correctly concedes that the plaintiffs presented substantial evidence to support their claims based on (1) tax liability, (2) fraud, and (3) faulty supervision. Moreover, it concedes that the law in effect at the time of the trial did not require the jury to award compensatory damages in order to award *823 punitive damages. Even further, it states: "[W]e will not apply the new rule of law announced today to the judgment...." 719 So.2d at 807. Thus, one would logically expect the per curiam opinion to affirm the judgments of the trial court. Strangely, however, that is not what happens. Instead, the per curiam opinion reverses the judgments and remands these causes for a new trial. This it does on a ground that a majority of this Court raises ex mero motu. Specifically, a majority of this Court reverses these judgments on the basis of Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981).
The Aspinwall rule is as follows:
"[I]f a complaint has more than one count and the defendant believes that the evidence is not sufficient to support one or more of those counts, he must challenge this by motion for directed verdict, specifying the count which is not supported by evidence and detailing with specificity the grounds upon which the particular count is not supported by the evidence. If this is not done and all counts go to the jury and a general verdict is returned, the court will presume that the verdict was rendered on a valid count."
Id. at 138 (emphasis added). The action in Aspinwall was tried to a jury on counts of "(1) breach of contract, (2) fraud, (3)[the] tort of outrage, and (4) [bad faith] failure to pay an insurance policy." Id. at 135. The jury awarded the plaintiff $2,702.80 on the contract claim. Id. It also awarded the plaintiff $1 million on the three tort claims, without specifying which of those three counts it used as a basis for the award. Id. at 138. This Court reversed the judgment as to two of the defendants, id. at 136, but it affirmed the judgment as to the two remaining defendants, Old Southern Life Insurance Company and F.G. Compton (collectively "Old Southern"). Id. at 137-38. The affirmance of the contract award was conditioned on the plaintiff's accepting a remittitur of $500, and the affirmance of that portion of the judgment based on the general verdict on the other three counts was conditioned on the plaintiff's accepting a remittitur of $750,000. Id.
After adopting the above-stated rule, in its extended opinion on application for rehearing, the Court discussed whether Old Southern had sufficiently "challeng[ed] by motion for directed verdict the [alleged] failure of the plaintiff to make out a case under the [count alleging the] tort of outrage and the [count alleging the] tort of bad faith refusal to pay an insurance claim," that is, whether Old Southern had "argu[ed] the motion with [the necessary] specificity." Id. at 138. The Court concluded that it had not done so, explaining that, although Old Southern had moved for a directed verdict on each of those counts, it had "not preserv[ed] error as to the tort of outrage because the insufficiency of the evidence was not argued with sufficient specificity." Id. (Emphasis added.)
Purporting to apply the rule of Aspinwall, the per curiam opinion states:
"[T]he negligence/wantonness claim asserted by Vanche, Janelle Smith, Christina Smith, and Duffee against Life of Georgia is barred by the statute of limitations to the extent that it involves actions by Life of Georgia that occurred before September 9, 1991, but it is not barred in relation to actions by Life of Georgia occurring on or after September 9, 1991. Thus, the trial court erred by denying Life of Georgia's motions for partial judgment as a matter of law on these four plaintiffs' negligence/wantonness claim.
"Because the negligence/wantonness claim went to the jury in full when it should not have as to four of the five plaintiffs, we have a `good count-bad count' situation in this appeal analogous to that in Aspinwall v. Gowens, 405 So.2d 134 (Ala. 1981)."
719 So.2d at 803 (emphasis added). Thus, the per curiam opinion concludes that damages awarded for conduct that occurred before September 9, 1991, were awarded pursuant to a "bad count," while damages awarded for conduct that occurred on or after September 9, 1991, were awarded pursuant to a "good count." Applying Aspinwall to these facts is illogical and inconsistent, for at least two reasons.
First, the per curiam opinion cites no authorityand I am aware of nonefor the proposition that damages based on pre-September 9, 1991, conduct constitutes a "count" *824 as contemplated by Aspinwall. A "count" is defined as "a separate and independent claim." Black's Law Dictionary 348 (6th ed.1990). "A `cause of action' ... is the sequence of factual events giving rise to a lawsuit, while a `claim' (or `count') is the legal theory under which relief is sought." Nunley v. Kloehn, 158 F.R.D. 614, 617 (E.D.Wis. 1994) (emphasis added).
Under these definitions, damages based on pre-September 9, 1991, conduct would constitute not a "count," butat besta "part-claim." But even if "part-claims" could be subject to the Aspinwall rule, these are not. That is so, because LOG and Winsett utterly failed to lay the predicate in the trial court for a reversal under the Aspinwall rule. More specifically, in order to obtain a reversal based on the Aspinwall rule, Life of Georgia and Winsett would have had to move the trial court for a directed verdict on each and every claim alleged to have been deficient, and, in addition, they would have had to apprise the trial court of the reason for the deficiency. They did neither of these things.
Indeed, the per curiam opinion recognizes this failure, stating that "the trial court erred by denying Life of Georgia's motions for partial judgment as a matter of law on these four plaintiffs' negligence/wantonness claim." 719 So.2d at 803 (emphasis added). Thus, what the per curiam opinion concedesat least implicitlyis that LOG and Winsett did not move for a directed verdict on this "part-claim." Instead, they moved for a directed verdict on the improper hiring and supervision countin toto. Moreover, at no time did they attempt to inform the trial court, or argue to it, that the statute of limitations barred recovery of damages under this claim in part. Thus, "the insufficiency of the evidence was not argued with sufficient specificity," 405 So.2d at 138, to invoke the Aspinwall rule. The defendants' noncompliance with the Aspinwall rule absolutely precludes their relief under that rule.

B. Retroactive Application of the New Rule
The per curiam opinion implicitly concedes that it is unfair to apply the new rule created in that opinion to the judgments entered in these cases. Nevertheless, it proceeds to do so, saying: "[W]e are unwilling to search this trial record, as we have done in some previous cases, for some indicium of nominal damage." 719 So.2d at 807. Despite the semantics, that refusal constitutes a retroactive application of the new rule.
In short, the per curiam opinion's disposition of these cases is virtually inexplicable. It goes far out of its way to reverse a judgment that it concedes was supported by the evidence and was consistent with the law at the time it was entered. Therefore, except as to those aspects of the per curiam opinion with which I have expressly concurred, I respectfully dissent.
NOTES
[1] Effective October 1, 1995, Rule 50, Ala. R. Civ. P., was amended, as a matter of form only, so as to rename "motions for directed verdict" and "motions for judgment notwithstanding the verdict" as "motions for judgment as a matter of law." Rather than continue to use the terminology of the former rule, which terminology is used in the briefs and the record in this proceeding, we have used in this opinion the terms used in the amended rule.
[2] The specification of damages required by § 6-11-1 was not applicable because the plaintiff's cause of action had accrued before the effective date of the statute.
[3] If the plaintiff previously has been made whole for harm or damage for which the defendant otherwise would have been liable, such as through a pro tanto settlement or a tender not part of an offer of compromise, thereby making an award of compensatory damages inappropriate, this option should be omitted from the form.
[4] It also awarded Dr. Gore $4,000 in compensatory damages. 646 So.2d at 622.
[5] The cost of repair, that is, of "refinishing Gore's automobile was $601." 646 So.2d at 621. That cost was approximately 1.47% of the $40,750.88 he paid for the BMW. Id.
[*] Although Justice Lyons was not a member of this Court when these cases were orally argued, he has listened to the tape of oral argument and has studied the record.
[6] Another description of the operation and mechanics of a cafeteria plan with an FSA, administered by a "professional administrator," appeared in M. Edwards, Reduce Payroll Taxes with a Cafeteria Plan, 82 Ill. Bar J. 161, at 161 (March 1994): It stated, in part:

"Employees contribute funds to pay expenses for group health insurance premiums, medical and dental expenses not reimbursed by insurance, and daycare expenses for both children and dependent adults....
"Employee withholdings for each pay period are sent to the plan administrator for deposit to a bank trust account.
"As employees incur medical and daycare expenses, they complete a simple one-page form to document the expense and submit their claim to the plan administrator.
"The plan administrator reimburses the employee by separate check or through [the employee's] payroll."
[7] Bohlken was also a defendant in these present actions, but he obtained a jury verdict in his favor; therefore, he is not involved in these appeals.
[8] The Court of Civil Appeals reversed a summary judgment entered for the defendants, and remanded the cause for further proceedings. 701 So.2d at 1132.
[9] This affidavit was filed in the United States District Court for the Southern District of Alabama in support of the motion of Contorno, Inc., to remand the cause from that court to the Baldwin County Circuit Court, from which it had been removed at the instance of LOG. The affidavit and Contorno's brief in support of its motion to remand are included in the record of this case. Docket No. 95-0478-P-S.
[10] This proposed regulation was to be "effective for years beginning after December 31, 1988." ¶ 1253.01, Note.
[11] System Dynamics Int'l, Inc. v. Boykin, 683 So.2d 419 (Ala.1996), cited in the per curiam opinion, is not inconsistent with this conclusion. Boykin is legally and factually distinguishable from Jackson and from this case.