This case involves a claim for default on an automobile lease and a counterclaim alleging fraud in the inducement to consummate the lease.
On February 2, 1989, World Omni Leasing, Inc. (WOLI) filed an action against Floyd and Bethena Valentine for $5,675.91, which WOLI alleged was the amount of deficiency after the repossession and sale of a 1985 Toyota Camry that had been leased in their names. The Valentines counterclaimed, alleging that Bethena was induced to sign the lease after representatives of Sutherlin Toyota, Inc. (Sutherlin), acting as an agent for WOLI, told her that she and Floyd would not be legally responsible for the lease. The case was tried before a jury which returned a verdict against the Valentines for $6,981.37 for the deficiency plus costs and interest. After the Valentines' post-trial motion was denied, they appealed.
The record indicates that Bethena went with her daughter, Toni, to look for a car at Sutherlin in August 1985, while Toni was living with her parents. The evidence conflicts whether the dealer at Sutherlin induced Toni to sign her father's name on the lease agreement or whether Toni initiated that action. Toni was not a named party to this lawsuit but testified by affidavit as follows:
 "On August 31, 1985, my mother, Bethena Valentine, and I visited Sutherlin Toyota . . . to lease or buy a car from them for me to drive. I found a car I liked, a 1985 Toyota Camry, and David Quick, a salesman, began to fill out the paperwork to get the car. Mr. Quick did a credit check on me and found I had a bad credit rating. . . . Mr. Quick suggested that the car be leased in the name of my father, Floyd Valentine, and Mr. Quick told me that it would be Okay for me to sign Floyd Valentine's name even though I did not have his permission to sign his name. . . . Mr. Quick told me and my Mother that neither Floyd Valentine or Bethena Valentine would be legally or financially responsible for making the lease payments and that I would be the only person responsible since I had possession of the car and was making the payments."
Bethena testified that Quick suggested that she and Toni call Floyd. When it was discovered that Floyd was not home, Quick suggested, in the presence of two other men, Mr. Chesser and Mr. Watson, that it would be all right if Toni signed Floyd's name. Bethena testified that initially she was reluctant to sign, but Quick assured her that she was not responsible for the car because Toni would be making the lease payments and it would be Toni's car. Bethena further testified to an exchange among the three men which resulted in the suggestion that she and Toni go around the block to sign Floyd's name to the lease, and that this is in fact what occurred. She also testified that she expressly questioned Quick regarding any financial responsibility by her and Floyd, and she was again reassured that they would not be responsible. She also asked Quick what would happen if Toni brought the car back before the expiration of the lease and she was *Page 1008 
assured that Toni could return the car early without penalty.
Quick's testimony differs from the testimony of Toni and Bethena. He testified that Toni and Bethena merely left the dealership and returned with Floyd's name signed to the papers. Quick testified that he did not suggest to anyone to forge Floyd's name, and that he advised them that the people named on the contract were the ones responsible for payment.
Toni acknowledged that she signed her father's name to the lease and that Bethena signed her own name to the same lease. Toni drove the car home on August 31, 1985, but the lease was not approved until September 4, 1985. Sutherlin entered into the lease agreement with Floyd and Bethena Valentine as lessee, and then they sold the lease to WOLI. WOLI made all contacts with Toni regarding late payments, repossession of the car, and notice of the sale of the car at auction.
The evidence is not disputed that Floyd was unaware that Toni intended to sign his name to the lease, and that he at no time gave her the authority to do so. Floyd testified that although he never attempted to have his name removed from the lease, he never used the car nor derived any benefit from it. Floyd testified that he had no contact with anyone about the car, and that he never made a payment on it and the evidence also did show that Floyd directed all correspondence and phone inquiries regarding the car to Toni. Floyd further testified that it was his understanding that Toni was legally responsible for the car.
The Valentines submitted as evidence of fraud, portions of court files in sixteen other cases involving WOLI or Toyota Motor Credit Company where fraud was alleged. WOLI filed a motion in limine seeking to prohibit the Valentines from calling certain witnesses from these prior cases. WOLI argued that other cases were not similar enough to warrant admission because they did not involve an inducement to enter into a lease by suggesting that the customer sign another name on the lease, and then assuring the customer that the person whose name was signed would not be held accountable on the lease, since the customer would be making the payments.
The trial court conditionally granted WOLI's motion in limine, and later heard testimony from three of the witnesses as an offer of proof by the Valentines outside the presence of the jury. At that time, WOLI's motion was granted and the testimony was not allowed to be heard by the jury. The record reveals that this testimony proffered by the Valentines involved situations where representatives of Sutherlin allegedly told customers that they could trade in the old leased car for a new one or turn the old car in without a penalty after making one-half or more of the payments under the lease agreement. These customers later attempted to "trade out" of their leases after reaching this half-way mark but were not allowed to do so. Allegedly, Quick made some of these representations. Feeling like Sutherlin had refused to uphold their end of the bargain, the customer would become frustrated, return the vehicles, and cease making payments. WOLI would then sue for the deficiency, pointing out the lease terms which varied from what they were told by the dealer. The customer would counterclaim alleging fraud. These cases occurred between 1983 and 1987.
The Valentines argued to the trial court that there is a similarity in these representations because all of them involve Sutherlin employees "saying whatever it takes" to induce a lessee to sign a lease, and then Sutherlin would renege on its promises. Although the Valentines were primarily offering this testimony to establish a "pattern and practice" of intentional, wrongful conduct to justify punitive damages, they contend on appeal that the testimony of these witnesses should also have been allowed for purposes of impeachment because at the trial of the instant case, Quick denied ever representing to other customers that they could trade out of a lease early.
The Valentines argue that at this point, they should have been able to introduce testimony that Quick, Sutherlin, and/or WOLI have in fact perpetrated such frauds. We find that these past representations *Page 1009 
were not properly admissible to impeach Quick's testimony at that time in light of the motion in limine, because WOLI's objection to this line of questioning was sustained. Therefore, the door was not "opened" to go into this excluded evidence at that time. We hold, however, that this was relevant evidence for the purpose of showing an intent to fraudulently induce Bethena to sign the lease for her daughter.
Accordingly, the dispositive issue on appeal is whether the trial court erred by not allowing testimony from the proffered evidence for the purpose of showing a pattern or practice of intentional wrongdoing on behalf of Sutherlin in leasing cars.
We agree with WOLI that questions of materiality, relevancy and remoteness of evidence in a fraud case rest largely within the discretion of the trial court, and its rulings on those questions should not be disturbed on appeal unless that discretion has been grossly abused. Dorcal, Inc. v. XeroxCorporation, 398 So.2d 665 (Ala. 1981). In cases such as this one, however, the trial court is to allow great leniency in passing upon the admissibility of collateral matters so as to afford the admission of any relevant evidence bearing upon the ultimate issue of fraud. Potomac Leasing Co. v. Bulger,531 So.2d 307 (Ala. 1988); Dorcal, supra.
Further, while evidence of past dealings of a party with non-parties is generally excluded as irrelevant, when the intent of the party is at issue, that party's prior conduct and acts on other occasions which have a bearing on that party's intent in a subsequent action is competent evidence.Roberson v. Ammons, 477 So.2d 957 (Ala. 1985). Our supreme court has held and consistently affirmed the principal that:
 "Great latitude is allowed in admitting evidence on the issue of alleged fraud. . . . Most often the perpetrator of fraud is the sole possessor of actual knowledge of such fraud. Undue restriction should not be placed on the introduction of evidence which has probative value, however slight, on this issue. Weight is for the jury. . . ."
(Citations omitted.) Kabel v. Brady, 519 So.2d 912, 919 (Ala. 1987).
The evidence in question concerns previous business practices similar to the one in issue. The commission of similar wrongs by a party to civil actions has been allowed to prove knowledge, design, intent, motive, malice and wantonness to show a fraudulent intent, plan or scheme. Such evidence is admissible to show that a party committed similar fraudulent acts against other persons about the same time which appear to be in keeping with a common plan or scheme to defraud. Roan v.Smith, 272 Ala. 538, 133 So.2d 224 (1961).
WOLI argues that allowing this testimony would be a gross violation of the requirement that to establish a pattern of fraud, the representations must be similar. We find no cases requiring that the facts in the previous cases be identical or nearly identical to the ones made in the case seeking admission of prior representations in their effort to establish a fraudulent intent.
In Shelby Mutual Insurance Co. of Shelby, Ohio v. Ralston,369 So.2d 285 (Ala.Civ.App. 1979), an insured brought an action against an insurer to recover under a homeowner's policy. The insurer's defense was that the insured did not own the property which he claimed was vandalized. The insurer attempted to offer evidence of the insured's prior conviction for attempted false pretenses as relevant proof of the insured's requisite intent to misrepresent material facts for pecuniary gain. The trial court denied the request and we held that evidence of the prior conviction was relevant to the issue of whether the insured had the requisite state of mind to defraud the insurer. We further held that in civil cases,proven contemporaneous fraudulent transactions of the same character by the same party, were admissible to show fraud in a transaction wholly distinct from the previous transaction.Ralston, supra.
Accordingly, there must first be evidence that the representation made to the plaintiffs was false; then the plaintiff may offer evidence of similar representations at the same time for the purpose of bolstering the conclusion that the representation made to the plaintiff was also false. C. *Page 1010 
Gamble, McElroy's Alabama Evidence, § 70.03(1) (1977). It is established that "other fraudulent transactions must be proven
to be admissible; mere rumor of fraud on the part of the defendant will not suffice as admissible evidence." (Emphasis in original.) Ralston, supra at 286.
WOLI argues that allowing this testimony would open the floodgates for testimony against any defendant in a fraud case from any prior lawsuits where fraud was alleged. The requirement that there must be proof of fraudulent transactions by the same party, of the same character, before this evidence can be admitted alleviates WOLI's concern.
In the instant case, the Valentines allege fraud in the inducement in their counterclaim. They contend that Quick told Bethena that she and her husband could sign for Toni, but would not be responsible for payments on the car, and they were, in fact, held responsible. In the other cases proving fraud, the evidence was that Sutherlin salesmen told other customers that they could "trade out" of a lease early, when in fact, they could not. Both situations allegedly involve salesmen anxiously making false claims to induce a contract. While different salesmen may say different things to different customers, the objective, however, remains the same, i.e., to close the contract by sale or lease of the car.
Having found reversible error, we hold that the Valentines are entitled to a new trial allowing testimony from the other cases where fraud was proven. The questioned evidence here is relevant to illustrate the motive or intent of the parties on the occasion in question, which goes to the very core of the Valentines' case.
So holding, we need not address the other issues raised on this appeal.
REVERSED AND REMANDED WITH INSTRUCTIONS.
ROBERTSON, PJ., and RUSSELL, J., concur.