821 So.2d 923 (2001)
Kenneth M. MORRIS, d/b/a Morris Pest Control[*]
v.
Roger A. LASTER and Lola Laster.
S.E.C.U.R.E. Underwriters Risk Retention Group
v.
Roger A. Laster et al.
1990386 and 1990401.
Supreme Court of Alabama.
April 6, 2001.
*924 Robert V. Wood, Jr., and Jonathan B. Medlock of Spurrier, Rice, Wood & Hall, Huntsville; and Rebecca A. Walker of Torbert, Torbert & Walker, L.L.C., Gadsden, for appellant Morris Pest Control.
L. Tennent Lee III of Burr & Forman, L.L.P., Huntsville, for appellant S.E.C.U.R.E. Underwriters Risk Retention Group.
David H. Marsh, Nat Bryan, and Thomas M. Powell of Marsh, Rickard & Bryan, P.C., Birmingham, for appellees.
Michael L. Roberts of Cusimano, Keener, Roberts, Kimberley & Miles, P.C., Gadsden, for amicus curiae Alabama Trial Lawyers Ass'n, in support of application for rehearing.

On Application for Rehearing
PER CURIAM.
The opinion of December 29, 2000, is withdrawn and the following is substituted therefor.
Kenneth M. Morris, doing business as Morris Pest Control (a sole proprietorship owned and operated by Kenneth M. Morris) appeals from a judgment entered on a jury verdict against him in the Marshall *925 Circuit Court (appeal no. 1990386). We reverse and remand. S.E.C.U.R.E.[1] Underwriters Risk Retention Group is the liability-insurance carrier for Morris; it also appeals, complaining of certain provisions of that judgment as they relate to its coverage obligations (appeal no. 1990401). Because we reverse the judgment against Morris, we dismiss S.E.C.U.R.E.'s appeal as moot.

I. Factual Background
This case resulted from the sale of a home to Roger A. Laster and his wife Lola Laster. The contract of sale provided that at the closing of the purchase of the home, the Lasters would receive an "Official Alabama Wood Infestation Inspection Report," commonly referred to as a "termite letter," from the sellers, Barry Aaron and Paula Aaron. The listing agent for the sale of the Aarons' home was Bud Moore, of the Graben Real Estate company. Graben Real Estate is a franchisee of a nationwide real-estate firm, Coldwell Banker.
Apparently Moore, or one of his employees, contacted Morris Pest Control a few days before the closing and asked Morris to inspect the home and to provide a termite letter to document what the inspection revealed.[2] Morris conducted the inspection. He noted on the Official Alabama Wood Infestation Inspection Report the presence of both previous and active wood-decaying fungus, and he noted on it that he had subsequently treated the home. According to Morris's own testimony, the fungus he discovered was "devastating" and "severe."
However, Morris failed to note on the report the presence of either powder-post-beetle holes or termite trails, two signs of different kinds of wood infestation. Another pest-control company had inspected the Aarons' home two days before Morris inspected it, and that company had discovered extensive evidence of prior termite and powder-post-beetle infestation, as well as rot damage from the wood-decaying fungus. However, only the Morris report was shown to the Lasters on the day of the closing.
After the Lasters discovered the damage to the home they had recently purchased, they contacted, among others, the Alabama Department of Agriculture and Industries. The Department sent an employee to inspect the Lasters' home. The state inspector discovered significant damage to the home from wood-decaying fungus, powder-post beetles, and subterranean termites. Approximately two months later, the Lasters filed a lawsuit in the Marshall Circuit Court against Coldwell Banker; Coldwell Banker Residential Affiliates; Graben Real Estate; Bud Moore and Jan Miller, acting as agents and employees of Coldwell Banker and Graben; Barry Aaron and Paula Aaron; and Morris, doing business as Morris Pest Control. The Lasters later amended the complaint to name Cook's Pest Control company as an additional defendant. The Lasters alleged that the defendants were liable for *926 misrepresentation and/or suppression of material facts; fraud in the inducement of a contract to purchase the home; breach of an express or implied warranty of habitability; negligence and/or wantonness; and deceit.
The trial court entered a summary judgment in favor of Cook's Pest Control, and the Lasters agreed to a pro tanto settlement of $510,000 with all of the other defendants except Morris; the Lasters reserved their claims against Morris, who was not a party to the settlement. The claims against Morris proceeded to trial, with the jury ultimately returning a verdict for $19,000 in compensatory damages and $400,000 in punitive damages. The court entered a judgment on the verdict. Morris filed a series of postjudgment motions, including a motion for a new trial. S.E.C.U.R.E. was allowed to intervene to resolve a question of liability-insurance coverage arising from the circumstances of this case.
Morris raises 11 issues on appeal. These can be grouped into three main categories: 1) whether the trial court properly ruled on certain evidentiary matters; 2) whether the charges to the jury were properly stated; and 3) whether the trial court properly applied this Court's standards for reviewing punitive-damages awards. We conclude that the trial court erred by admitting improper "pattern-or-practice" testimony and in publishing information about the pro tanto settlement to the jury, over Morris's objection. Because of these errors in the trial court's evidentiary rulings, we reverse the judgment. We pretermit discussion of the other issues Morris raises on appeal. S.E.C.U.R.E. contends on appeal that it is not responsible for paying the punitive-damages award against Morris. Thus, because we remand the case for a new trial, S.E.C.U.R.E.'s appeal is moot; that appeal is dismissed.

II. Pattern-or-Practice Testimony
Morris argues that the trial court improperly admitted testimony from five particular witnesses, each of whom spoke about various aspects of Morris's past behavior. We review the admissibility of "pattern-or-practice" evidence on a fraud claim by an abuse-of-discretion standard. "[R]ulings on the admissibility of evidence are within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of that discretion." Bama's Best Party Sales, Inc. v. Tupperware, U.S., Inc., 723 So.2d 29, 32 (Ala. 1998) (citing Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165 (Ala.1991)).
Any analysis of "pattern-or-practice" evidence must begin with this controlling rule of evidence:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...."
Ala.R.Evid. 404(b).
The basic intent of Rule 404(b) is to exclude collateral character evidence, which ordinarily is likely to prejudice the jury and confuse the issues. However, this Court has long held that evidence of past unrelated acts, so-called pattern-or-practice evidence, may be admissible in certain circumstances when fraud is alleged. See Great American Ins. Co. v. Dover, 221 Ala. 612, 130 So. 335 (1930); Nelms v. Steiner Bros., 113 Ala. 562, 22 So. 435 (1897). In order for the pattern-or-practice evidence to be relevant and admissible, the collateral acts of fraud must be "substantially of the same character *927 [and] contemporaneous in point of time, or nearly so." Life Ins. Co. of Georgia v. Smith, 719 So.2d 797, 808 (Ala.1998) (citing Great American Ins. Co. v. Dover, 221 Ala. at 614, 130 So. at 336). Given the potential for prejudice and the general policy of preclusion, we have required high levels of similarity between the past acts and the present behavior. See Massachusetts Mut. Life Ins. Co. v. Collins, 575 So.2d 1005 (Ala.1990), cert. denied, 499 U.S. 918, 111 S.Ct. 1306, 113 L.Ed.2d 240 (1991). The acts must be both similar in nature and of substantially the same character. See Bama's Best Party Sales, Inc., 723 So.2d at 33.
It is important to note that external factors have affected the standard for admitting pattern-or-practice testimony during the past two decades. Even though Alabama has long recognized an exception for fraud claims, that exception, which had been narrow, expanded in the late 1980s as a consequence of the Legislature's first attempt at placing a cap on punitive damages.
"Section 6-11-21 was enacted as part of a `package of bills' collectively called `the Alabama Tort Reform Act.' L. Nelson, Tort Reform in Alabama: Are Damages Restrictions Unconstitutional? 40 Ala.L.Rev. 533, 533 (1989); Act No. 87-185, § 2, 1987 Ala. Acts 251. The section provides:
"`An award of punitive damages shall not exceed $250,000.00, unless it is based upon one or more of the following:
"`(1) A pattern or practice of intentional wrongful conduct, even though the damage or injury was inflicted only on the plaintiff....'"
Henderson v. Alabama Power Co., 627 So.2d 878, 880 (Ala.1993).
Because the admission of pattern-or-practice evidence was critical to an order upholding an award of punitive damages in excess of the statutory cap, courts tended to allow a broader range of such evidence. However, with the repeal of the old statutory cap on punitive damages and the substitution of a new series of restrictions, see § 6-11-21, Ala.Code 1975, we no longer have a basis for a broad reading of the pattern-or-practice exception by which evidence of other "intentional wrongful conduct" is made admissible.
Morris objected, both by two motions in limine and at trial, to the testimony of five witnesses; those witnesses were allowed to testify about various bad experiences they claimed to have had with Morris Pest Control.
The Lasters' theory to which they claimed these witnesses' testimony was relevant was the theory that Morris falsified termite letters so as to facilitate the financing or sale of homes. The Lasters argue that the real-estate transfer-and-financing market was the bread and butter of Morris's business and that Morris would not jeopardize its relationships with people involved in the industry by truthfully reporting a termite infestation or other problem in a home he inspected. It is this theory that must provide the basis for an evaluation of pattern-or-practice testimony. The trial court essentially framed the query as whether the proffered testimony would speak to the "honesty of the business." Such a liberal interpretation of the pattern-or-practice evidentiary standard permits the admission of far too much extraneous and potentially highly prejudicial testimony, and such an interpretation would defeat the fundamental purpose of Ala. R. Evid. 404(b) by allowing an unbridled exception.
The Lasters first called Ray Edgeworth as a witness, for the purpose of establishing that Morris had a pattern or *928 practice of failing to give truthful reports of termite infestation. Edgeworth testified that in order to refinance his home, he had needed to obtain termite treatment and to obtain a termite bond. According the Edgeworth's testimony, Morris sent Edgeworth a bill for termite treatment and for a bond, but apparently never performed the treatment and never furnished the bond. Approximately a year and a half later, Edgeworth testified, he discovered swarms of active termites in his son's bedroom; he said that upon being confronted about the problem, Morris simply refunded the money Edgeworth had paid for the treatment.
The Lasters then called a second witness, Reid Morgan, to testify to an alleged pattern or practice. Morgan testified that before he bought a home he obtained the services of Morris Pest Control and Morris issued a termite letter, representing that Morris had conducted an inspection and had detected no problems with the home. A month later, another termite inspection company found active infestations in several areas of Morgan's home. Again, we note that Morris's conduct alleged by Morgan is similar to conduct by Morris the Lasters allege as the basis of their fraud claim.
The Lasters next called as a witness Perry Broome. He testified that before the closing on the purchase of Broome's home, Morris provided a termite letter. Soon afterwards, Broome testified, Broome found evidence of active termites; termite damage eventually forced him to replace a bathroom floor. He further stated that Morris said he would have to cut a hole in the floor to treat certain areas, even though previously Morris had apparently said he had visually inspected these areas. We see significant similarities between the facts alleged by the Lasters and the facts testified to by Broome. The question whether the testimony of Edgeworth, Morgan, and Broome showed that Morris had carried on a pattern or practice of making inaccurate inspections and keeping incorrect records was a question proper for the jury to consider.
The Lasters next called Jim Franklin to testify as to his experience with Morris Pest Control. Franklin testified that he had hired Morris to "pretreat" a home Franklin was building; that although Franklin had not suffered any infestation, Morris apparently used too little of the required chemicals; that Morris also agreed to return to perform follow-up visits every year; and that Franklin believed Morris did not make those follow-up visits. Here, Franklin's testimony, supposedly offered to prove a pattern or practice by Morris, devolves into a more general assault upon Morris's business and professional practices. The plaintiff and the defense attorneys had stipulated to Morris's standing objection to the introduction of this evidence, an objection based upon a lack of similarity. If Franklin's testimony is true, then Morris may be poor at pest control, but the conduct Franklin testified to does not parallel the alleged conduct made the basis of the Lasters' action or the conduct described by the other pattern-or-practice witnesses.
The final witness called by the Lasters was Jerry Maynor, a former employee of Morris Pest Control. Morris objected to Maynor's testimony, on two grounds. First, Morris argued Maynor's testimony was not within the narrow exception for pattern-or-practice evidence. Second, Morris argued that Maynor was a surprise witness. We find the first argument convincing. The Lasters wanted Maynor to testify as to Morris's alleged pattern or practice of falsifying termite letters so as to appease real-estate agents. The trial court did not allow the Lasters to call *929 Maynor as a direct witness, because they claimed to have "found" Maynor only one day earlier. The trial court properly recognized the difficult position in which Maynor's testimony would place defense counsel. However, the trial court allowed the Lasters to call Kenneth Morris, the owner of Morris Pest Control, and ask him a series of questions about his past professional relationship with Maynor. The Lasters asked Morris general questions about fraudulent practices and specifically inquired of him about a particular client Morris might have had eight years earlier. Morris denied ever falsifying any termite letters himself and denied instructing Maynor to falsify any letters. The questioning of Morris was brief and perfunctory.
The Lasters then called Maynor to the stand, ostensibly as a rebuttal witness. His testimony briefly rebutted Morris's assertions that Morris had good business practices and then it proceeded to meander through a litany of allegations regarding frauds that Maynor claims to have seen while he was employed by Morris. The substance of Maynor's testimony spoke to an alleged pattern or practice of fraud and was only thinly veiled as rebuttal testimony. Much of his testimony would not have been admissible under pattern-or-practice standards that adhered to the requirement that the pattern-or-practice evidence indicate conduct that had a substantial similarity to the conduct now alleged. Maynor spoke at length regarding allegations that Morris had used improper pest-control chemicals and an allegation that Morris had by deceit induced an elderly couple to purchase an unnecessary termite bond from Morris. Morris objected to Maynor's testimony both because of the Lasters' failure to disclose Maynor as a potential witness and because, he claimed, the conduct it indicated lacked the similarity required of pattern-or-practice testimony. By its nature and its substance, Maynor's testimony as to conduct lacking the requisite similarity was prejudicial, and the admission of that testimony was beyond the discretion afforded the trial court to admit evidence of "other ... acts" as an exception to Ala. R.Evid. 404(b).

III. Publication of Pro Tanto Settlement
The second ground for reversal is the trial court's improper publication to the jury of the pro tanto settlement. Morris filed a motion to take a postjudgment credit with respect to the pro tanto settlement reached between the Lasters and several codefendants originally named in the lawsuit. The trial court denied the motion and related the substance of the settlement to the jury, with the instruction that the jury "determine from the evidence the total amount of damages suffered by the plaintiffs and then give credit for the $510,000 which the plaintiff [sic] has already been paid by the other parties. And render verdicts for the plaintiff [sic] for the balance remaining." The sum of the instruction closely follows the suggested language of Instruction 11.30, Alabama Pattern Jury Instructions: Civil (2d ed.1993).[3]
Morris contends that he should be given the option to inform the jury of the settlement amount or, at his sole election, not to inform the jury of any settlement that will be set off and instead have the judge perform a postverdict calculation, subtracting *930 any pro tanto settlement amount from any verdict.
Alabama law has long recognized the principle that a plaintiff injured by joint tortfeasors may accept a partial satisfaction and release from one or more of the tortfeasors and still maintain an action against the remaining tortfeasors. See, e.g., Williams v. Colquett, 272 Ala. 577, 133 So.2d 364 (1961); Steenhuis v. Holland, 217 Ala. 105, 115 So. 2 (1927). The remaining defendants may either plead the release as a bar to recovery or place the release in evidence to show payment for the injury. See Anderson v. Kemp, 279 Ala. 321, 184 So.2d 832 (1966). This Court has previously held that for a defendant to assert a set-off defense arising from a pro tanto settlement, he must interpose this defense with specificity at the first opportunity, because it is an affirmative defense. See Hardman v. Freeman, 337 So.2d 325 (Ala.1976); Wylam Ice Co. v. King, 293 Ala. 359, 362, 304 So.2d 1, 3 (1974). If a joint tortfeasor is put to trial and fails to raise this defense at trial, he "is not entitled to [postjudgment] relief [because] he did not raise the defense of pro tanto settlement at his first opportunity." Miller v. Dacovich, 355 So.2d 1109, 1110 (Ala. 1978). However, if no pro tanto settlement is entered until after a judgment has been entered against a defendant, or if other conditions are present that preclude the defendant from pleading or proving a pro tanto settlement as a set-off, a set-off against the plaintiff's judgment against the remaining defendant is appropriate as soon as the settlement is completed. See Hardman, 337 So.2d at 326-27. Any amount recovered by the plaintiff in a pro tanto settlement thus reduces the amount owed by the remaining defendant, because there can be only one satisfaction of a claim. See Williams, 272 Ala. at 582, 133 So.2d at 368.
"While apprising the jury as to the amount of a pro tanto settlement is a matter of right, the manner and remaining content of that apprisal is discretionary with the trial court." Charles W. Gamble, McElroy's Alabama Evidence, § 188.06 (5th ed. 1996). The defendant must move to admit a pro tanto settlement in order for a jury to consider it. However, after the defendant asserts his right to admit the settlement, the trial court has discretion on how to convey the particulars of the settlement to the jury. See Bucyrus-Erie Co. v. Von Haden, 416 So.2d 699, 702 (Ala.1982); Instruction § 11.30, Alabama Pattern Jury Instructions: Civil (2d ed.1993). "[T]he Court, in lieu of allowing the defendant to place the pro tanto settlements into evidence, could instruct the jury on the total amount of the settlements...." Tatum v. Schering Corp., 523 So.2d 1042, 1045-46 (Ala.1988).
We have held that a trial court must enforce a set-off of a pro tanto settlement no matter when the settlement is reached. In Campbell v. Williams, 638 So.2d 804 (Ala.), cert. denied, 513 U.S. 868, 115 S.Ct. 188, 130 L.Ed.2d 121 (1994), the settlement between the plaintiff and several defendants was not made final until after the jury had returned its verdict. In that case, the defendant, Campbell, argued that because he was unable to plead or prove the settlement to the jury, the verdict was invalid. 638 So.2d at 812. This Court concluded that the trial court must give effect to a pro tanto settlementreducing the damages assessed against the remaining defendantand if that cannot be accomplished by having the defendant plead or prove the settlement, other means are acceptable.
"[T]he defendant did not have the opportunity to place the pro tanto settlement before the jury; therefore, the trial judge simply allowed a set-off of the *931 amount of the pro tanto settlement against the amount of the general verdict in lieu of the settlement being pleaded before the jury. Dr. Campbell received the relief to which he would have been entitled if the pro tanto settlement had been known."
Id. at 812.
The question presented for our review is whether the defendant has a right to prevent the jury from hearing any information about a pro tanto settlement and to elect to have the trial court calculate the set-off. We find authority for this not only in Campbell, but also in the language of Works v. Allstate Indemnity Co., 594 So.2d 60 (Ala.1992), which presented a conflict closely resembling the conflict between Morris and the Lasters. In Works, the defendant, Allstate, made a motion in limine to preclude Works from mentioning to the jury a pro tanto settlement and release Works had entered with another defendant. This Court held that it was not reversible error for a trial court to grant a defendant's request not to publish information to the jury about a pro tanto settlement. Id. at 64. Both Campbell and Works support Morris's proposition that the defendant has a right not to inform the jury of any pro tanto settlements but rather to have the trial court set off the settlement amount post-judgment.
Whether a defendant wants to inform a jury about a settlement the plaintiff has made with a third party is a key strategic element of trial practice. We have previously explicitly extended to the defendant the option of pleading a settlement as an affirmative defense or allowing the defense to admit the settlement as evidence. See Anderson, 279 Ala. 321, 184 So.2d 832 (1966). Because the choice of how to raise a settlement as a defense rests squarely with the defendant, we think the defendant must be allowed the election of either informing the jury of the settlement or choosing a postjudgment set-off performed by the trial court. Because the defendant must move to admit evidence of the settlement, as a corollary he should be able to choose not to admit the evidence and to have the trial court give effect to the pro tanto settlement after the verdict is returned. The trial court, when it published to the jury the details of the settlement between the Lasters and various defendants, did so over the objection of Morris. Its doing so was reversible error.

IV. Conclusion
Because the trial court erred in admitting the testimony of two of the pattern-or-practice witnesses and improperly notified the jury of the pro tanto settlement over the defendant's objection, we reverse the judgment against Morris and remand the cause for a new trial to be conducted in a manner consistent with this opinion.
APPLICATION OVERRULED; OPINION OF DECEMBER 29, 2000, WITHDRAWN; OPINION SUBSTITUTED;
1990386REVERSED AND REMANDED.
1990401DISMISSED AS MOOT.
MOORE, C.J., and HOUSTON, SEE, BROWN, WOODALL, and STUART, JJ., concur.
LYONS, J., concurs specially.
HARWOOD, J., concurs in part and dissents in part as to the rationale; concurs in the judgment; and dissents from the denial of rehearing.
JOHNSTONE, J., dissents.
LYONS, Justice (concurring specially).
Keeping a pro tanto settlement from the jury when doing so serves the plaintiff's interest appears to me to be just as compelling as the converse. The question *932 whether the details of a pro tanto settlement should be withheld from the jury unless both sides consent to disclose it must await another day and another case.
HARWOOD, Justice (concurring in part and dissenting in part as to the rationale; concurring in the judgment; and dissenting from the denial of rehearing).
Because I would grant the application for rehearing, I dissent from the order overruling that application. I concur in Part II of the opinion, "Pattern-or-Practice Testimony," but I dissent from Part III, "Publication of Pro Tanto Settlement." Because I agree that the holding as to Part II necessitates a reversal and remand, I concur in the judgment in case 1990386; and, as to the appeal by S.E.C.U.R.E. (case 1990401), I concur that it should be dismissed as moot.
My disagreement with Part III of the opinion, concerning what recognition a pro tanto settlement should be given at trial, is the statement therein that "the choice of how to raise [such] a settlement as a defense rests squarely with the defendant," with the result that "the defendant must be allowed the election of either informing the jury of the settlement or choosing a postjudgment set-off performed by the trial court." 821 So.2d at 931. Concluding that the approach the trial judge used in this caseof publishing to the jury the details of the pro tanto settlement after the defendant had filed a motion to take a postjudgment credit with respect to the settlementwas wrong, the majority reverses. I do not believe the trial judge abused his discretion in handling the pro tanto settlement issue. I do not agree that our caselaw establishes that "the defendant has a right to prevent the jury from hearing any information about a pro tanto settlement and to elect to have the trial court calculate the set-off." 821 So.2d at 931. The majority opinion rightfully points out that a defendant must plead a set-off defense arising from a pro tanto settlement, assuming he has a fair opportunity to do so, because it is an affirmative defense; it cannot be relied on to supply any credit against an ultimate adverse judgment if it is not timely raised. Once the defense has been raised, a fair interpretation of existing caselaw would allow the trial judge to exercise his or her discretion in determining how to accommodate the defense.
JOHNSTONE, Justice (dissenting).
I respectfully dissent from the holding, unprecedented in Alabama, that the trial judge erred to reversal in submitting the pro tanto settlement to the jury for a setoff over the defendant's objection that the judge should have concealed the pro tanto settlement from the jury and should have effected the set-off himself. I further respectfully dissent from the holding, also unprecedented in Alabama, granting to the defendant the unilateral "strategic option" either to exploit a prior pro tanto settlement by presenting it to the jury or to conceal the pro tanto settlement from the jury and to require the trial judge to set the pro tanto settlement off against any jury verdict without the knowledge of the jurors. The legitimate reason for allowing a defendant a set-off for the plaintiff's pro tanto settlement with a third party is to prevent a double recovery by the plaintiff. The legally recognized purpose has never been to allow the defendant to shift blame from itself or to suggest greed in the plaintiff or otherwise to prejudice the plaintiff in the minds of the jurors.
I have found no Alabama case reversing a trial judge for submitting a pro tanto settlement to a jury for a set-off. Certainly no case cited in the main opinion reverses a trial judge for this procedure. *933 The general rule in Alabama is that the trial judge does submit a pro tanto settlement to the jury for a set-off if the pro tanto settlement has been reached in time for the trial judge to do so. All of the cases cited in the main opinion are in accord with this observation. Indeed, Alabama Pattern Jury Instruction: Civil 11.30 is written to effectuate this procedure, and this instruction is used for this purpose by trial courts throughout this state probably every judicial workday.
If this Court is to announce a brand new rule, this Court should establish a new rule that is fair to both sides. Inasmuch as the trial judge is as qualified if not more qualified than the jury to subtract, without confusion, the amount of a pro tanto settlement from the amount of a jury award, a rule confining the authority for the set-off solely to the trial judge would be fair to both sides. Likewise, a rule granting to each side the absolute right to demand that the pro tanto settlement not be presented to the jury and that the set-off be effected solely by the trial judge would be fair. However, today's holding granting a unilateral "strategic option" to the defendant either to present the pro tanto settlement to the jury for its prejudicial tendencies as well as for its set-off value or to conceal the pro tanto settlement from the jury but still to get the set-off from the trial judge is no fairer than a rule granting the plaintiff the concomitant unilateral option to present the pro tanto settlement to the jury for some prejudicial value to the plaintiff or to conceal the pro tanto settlement from the jury and to relegate the setoff duty to the trial judge.
For these reasons, if this Court prefers to announce a brand new rule on the procedure for setting off pro tanto settlements, I propose that this Court grant both sides an absolute right to relegate the duty to effect the set-off to the trial judge without presentation to the jury. Such a rule would make the much-vaunted "level playing field" for this aspect of the case.
In no event, however, should we use a change in the law on this topic to deprive the plaintiffs of their judgment in this case. Rather, in all fairness, the change should be prospective only.
The main opinion relies on three cases for the proposition that the trial judge in the case before us erred to reversal in not according the non-settling defendant the "strategic option" and in submitting the pro tanto settlement to the jury for the set-off over the defendant's objection that the trial judge should have confined the set-off duty to himself. None of the three, Anderson v. Kemp, 279 Ala. 321, 323, 184 So.2d 832 (1966), Works v. Allstate Indemnity Co., 594 So.2d 60 (Ala.1992), or Campbell v. Williams, 638 So.2d 804 (Ala.1994), stands for this proposition. I will state each case to demonstrate.
In Anderson, the plaintiff reached a pro tanto settlement with some but not all defendants on the day of trial before striking the jury, and the judge instructed the jury to set the pro tanto settlement off against any damages it found. The jury assessed $750 in damages against the settling defendants and $750 in damages against the non-settling defendants; and the trial judge, apparently interpreting this verdict as a specification of the set-off, simply entered judgment in favor the plaintiff for the $750 assessed against the non-settling defendants. The plaintiff appealed and argued that the trial judge had erroneously instructed the jury to apportion damages among joint tort-feasors. Affirming the trial court, this Court held that the non-settling defendants were entitled to the set-off of the pro tanto settlement. The meaning of the discussion in Anderson, supra, is that the non-settling defendants may plead a pro tanto settlement *934 if it occurs soon enough to be pleaded, or, if it occurs too late to be pleaded, may prove it to the jury without pleading. Anderson does not hold that pleading a pro tanto settlement forecloses the disclosure of the settlement to the jury. The Anderson Court did not address any such contention, and no party advanced any such contention. The Anderson discussion merely relaxes the requirement for pleading a pro tanto settlement in the case of a settlement too late in the litigation for normal pleading. The non-settling defendants in Anderson did not interpose any objection at all to the disclosure of the pro tanto settlement to the jury, and the Supreme Court affirmed the disclosure. Thus Anderson hardly stands for the proposition that a trial judge errs in submitting a pro tanto settlement to a jury for a setoff.
In Works, supra, the plaintiffs, a father and son, sued a defendant motor-vehicle driver for negligently injuring the plaintiffson and sued the father's own insurer for underinsured motorist benefits. The plaintiffs reached a pro tanto settlement with the defendant-driver; the other defendant, the plaintiff-father's own underinsured-motorist-coverage carrier, filed a motion in limine to prevent the plaintiffs from disclosing the pro tanto settlement to the jury; and the trial court granted the motion in limine. The jury, trying the issue of what, if anything, the defendant-insurer owed on account of the defendant-driver's alleged negligence, returned a verdict for the defendant-insurer. The plaintiffs appealed the adverse judgment and assigned the ruling on the motion in limine as error. This Court affirmed on the rationale that disclosing the pro tanto settlement to the jury would have insinuated negligence on the part of the defendant-driver, the very issue to be tried between the plaintiffs and the defendant-underinsured-motorist-coverage carrier. The distinguishing feature of the Morris Pest Control case presently before us is that the guilt of the settling defendants here, even if invalidly inferred by the jury, would not imply the existence of any element of the plaintiffs' claim against the non-settling defendant Morris. Noteworthily, the Works Court did not say that the trial judge would have committed error by denying the motion in limine and submitting the pro tanto settlement to the jury for the set-off.
In Campbell, supra, after the jury returned a verdict against two defendants, one of them completed a pro tanto settlement with the plaintiff, and the trial judge set it off against the verdict. By postjudgment motion, the non-settling defendant complained that he should have been allowed to plead and to prove the pro tanto settlement to the jury. The trial judge denied the postjudgment motion. The non-settling defendant appealed, and this Court affirmed on the rationale that, because the non-settling defendant received from the judge acting without the jury all the relief the non-settling defendant could have obtained by presenting the pro tanto settlement to the jury, neither the trial judge's procedure nor the pro tanto settlement itself was inherently unfair. The trial judge in Campbell, supra, was affirmed for setting off the postverdict pro tanto settlement against the verdict against the non-settling defendant without jury intervention instead of reconvening the jury, or a jury, postverdict, to allow the non-settling defendant to exploit the pro tanto settlement before the jury. The Campbell trial judge was affirmed, not reversed. Neither the trial judge nor the Supreme Court recognized any "strategic option" in the defendant in Campbell.
As demonstrated, these cases do not support reversing the trial judge for submitting the pro tanto settlement to the *935 jury for the set-off. This Court should not reverse the trial judge for following this established and accepted procedure.
I further respectfully dissent from the holding that the trial judge abused his discretion in admitting some of the plaintiffs' pattern and practice evidence. The rationale of the main opinion is that the testimony of Jerry Maynor and Jim Franklin was not sufficiently similar to constitute "pattern and practice" evidence of the fraud committed by Morris Pest Control and Morris.
The law governing what collateral acts may constitute "pattern and practice" evidence of fraud is explained in Life Insurance Co. of Georgia v. Smith, 719 So.2d 797 (Ala.1998):
"Under well-established Alabama practice, `[e]vidence of similar fraudulent acts [is] admissible to prove an alleged fraudulent scheme.' Ex parte Georgia Cas. & Sur. Co., 531 So.2d 838, 841 (Ala.1988). Otherwise stated, evidence of collateral fraudulent acts is relevant and admissible for punitive damages purposes to demonstrate `a pattern or practice of fraud.' Foremost Ins. Co. v. Parham, 693 So.2d [409] at 428 [(Ala. 1997)]; Valentine v. World Omni Leasing, Inc., 601 So.2d 1006 (Ala.Civ.App. 1992); see, also, Ex parte State Farm Mut. Auto. Ins. Co., 452 So.2d 861, 863 (Ala.1984); Dorcal, Inc. v. Xerox Corp., 398 So.2d 665, 671 (Ala.1981) (`In fraud cases, where intent, knowledge and scienter constitute essential elements of the offense, evidence of similar frauds and misrepresentations [is] commonly admissible.').
"This is true, provided, of course, that the collateral acts evidencing a pattern or practice are `substantially of the same character [and] contemporaneous in point of time, or nearly so.' Great American Ins. Co. v. Dover, 221 Ala. 612, 614, 130 So. 335, 336 (1930) (emphasis added). Thus, Alabama practice does not require that the collateral acts be functionally identical to the conduct or misrepresentation forming the basis of the action. Ex parte Rowland, 669 So.2d 125, 127 (Ala.1995); Valentine, 601 So.2d at 1009; Shoals Ford, Inc. v. McKinney, [605 So.2d 1197 (Ala.1992)]. `"[C]onduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."' Youngblood v. Lawyers Title Ins. Corp., 746 F.Supp. 71, 72 (S.D.Ala.1989) (emphasis added), rev'd on other grounds, 923 F.2d 161 (11th Cir.1991)."
719 So.2d at 808. The conduct of Morris Pest Control and Morris himself that the main opinion holds dissimilar embraces acts with the same or similar purposes, results, victims, and methods of commission or acts that "otherwise are interrelated by distinguishing characteristics and are not isolated events"that is, interrelated acts of getting money from customers by misrepresenting the presence, absence, risk, or eradication of termites or powder post beetles.
In the case before us, although the real estate agent asked Morris and Morris Pest Control to perform an inspection of the house, the Lasters paid for the inspection. Morris failed to note in his inspection report the presence of powder post beetles and termite trails. Although Morris claims to have "missed" the presence of powder post beetles and termite trails, the presence of powder post beetles and termite trails was noted on an inspection report prepared by a representative of another pest control company who inspected the house several days before Morris.
*936 As pattern and practice evidence, Jerry Maynor, a former employee of Morris Pest Control, testified that Morris and Morris Pest Control performed many inspections for various real estate agencies and that Morris Pest Control and its employees usually performed the inspection just before the real estate closing on the property to be conveyed. He testified that, on more than one inspection report, he had seen Morris mark "No" to the question whether there was termite infestation when in fact termites were infesting the house. Maynor testified that he asked Morris why "he was putting `No' on infestation when [he] and [Morris] had just seen it." Maynor stated that Morris said "It's just, ah, that's just business, dude," and "We'll, we'll talk about all that later." Maynor testified further that Morris became angry with him when he noted infestations on inspection reports because "we can't make these people [(real estate agents)] mad at us. This is our bread and butter, dude." Maynor further testified that, after he had completed inspection reports to note infestations, Morris had changed those inspection reports to say no infestation.
Maynor testified also that Morris had instructed him to use in a restaurant a pesticide restricted from use in restaurants and that Morris had instructed him to falsify his records concerning his use of the restricted pesticide. He related another incident wherein he accompanied Morris on an inspection of an elderly couple's home. Maynor testified that underneath the home he and Morris had found minimal damage from a previous termite infestation. He stated that Morris told the elderly couple that they had a "bad" infestation of termites and that "one day [the floor] would just fall out from under them." Morris then quoted a price to the elderly couple. Maynor stated that when he and Morris returned to the office he confronted Morris about lying to the elderly couple.
Jim Franklin testified that he contracted with Morris Pest Control to pretreat his newly built home and to inspect and to treat his house every year thereafter. He stated that one year an employee of Morris Pest Control left a bill on his front door for the inspection and treatment of his home. Franklin testified that he told someone at Morris Pest Control that, because he, Franklin, works next door to his own home, he would have seen anyone from Morris Pest Control who had been at his home treating it. The next year, Franklin insisted that he accompany the employee of Morris Pest Control to his home for the inspection and treatment. Franklin specifically asked that Morris Pest Control notify him when the next inspection and treatment were to be performed. Again, Franklin received a bill on his front door after having not seen anyone from Morris Pest Control inspecting or treating his home. Suspicious that Morris Pest Control was not inspecting and treating his home, Franklin painted over the latch of the door to the crawl space under his home. He painted the latch completely so that the latch could not be opened without chipping the paint. Thereafter, he received a bill on his front door from Morris Pest Control. He checked the latch, found it had not been moved, and telephoned Morris Pest Control. Franklin testified that he told the woman who answered the telephone for Morris Pest Control that he was not paying for an inspection that he had not received, and that the woman stated that whether or not Morris Pest Control did the inspection did not matter so long as he paid for his termite bond, because Morris Pest Control had insurance and would pay to have his home fixed if it became damaged by termites.
*937 The defendants' variations on their pervasive and chronic theme of termite and beetle fraud merely demonstrate their ingenuity in pursuing the same general pattern and practice they successfully used on the Lasters. The variations do not warrant a reversal of the trial judge's admission of this evidence.
NOTES
[*] Note from the reporter of decisions: This case was originally published at 794 So.2d 1094. However, through an error in the publishing process, an incorrect version of that opinion was published. Thus, the opinion at 794 So.2d 1094 is not the opinion filed in the office of the Alabama Supreme Court clerk on April 6, 2001. The correct opinion is printed here.
[1] Some documents in the record carry the name "Secure Underwriters Risk Retention Group," but other documents in the record carry the name "S.E.C.U.R.E. Underwriters Risk Retention Group," and the notice of appeal carries the name "SECURE Underwriters Risk Retention Group."
[2] An "Official Alabama Wood Infestation Inspection Report" states that a "qualified inspector" is to "determine the presence or previous presence of an infestation of the listed organism" and that "[i]f visible evidence of active or previous infestation of listed organisms is reported, it should be assumed that some degree of damage is present." The form provides space for the inspector to identify the presence of subterranean termites, powder-post beetles, wood-boring beetles, dry-wood termites, and wood-decaying fungus.
[3] Contrary to the implication made in Justice Johnstone's dissent, the fact that the Committee on Pattern Jury Instructions has written a pattern jury instruction regarding publication of a pro tanto settlement to a jury in no way suggests that every settlement should be published to the jury.